BRITTANY K. BARKEI, a Minor by Kathleen Barkei, her Mother and Next Friend, *et al.*, Plaintiffs-Appellees, v. DELNOR HOSPITAL, Defendant-Appellant.

Second District   No. 2—88—0199

Opinion filed November 29, 1988.—Rehearing denied December 30, 1988.

Henry J. Burt, Jr., of Rathje, Woodward, Dyer & Burt, of Wheaton, and Francis D. Morrissey and Karen Kies DeGrand, both of Baker & McKenzie, of Chicago (Tracy D. Kasson, of counsel), for appellant.

Robert A. Clifford and Keith A. Hebeisen, both of Robert A. Clifford & Associates, of Chicago (Robert P. Sheridan, of counsel), for appellees.

JUSTICE NASH delivered the opinion of the court:

Defendant, Delnor Hospital, appeals from a judgment entered upon verdicts returned by a jury totaling $2,089,886.92 in favor of plaintiffs, Brittany Barkei, a minor, and Kathleen and Randall Barkei, the minor's parents. In this action, plaintiffs sought recovery of damages for personal injuries alleged to have been sustained by the infant minor after her birth and while being cared for in the hospital nursery, and the parents sought additional damages for the loss of the child's society as a result of her injuries. Plaintiffs pleaded both specific acts of negligence on the part of defendant hospital and general negligence under a *res ipsa loquitur* theory, both of which were submitted to the jury, which returned general verdicts for plaintiffs on which the trial court entered judgment. Defendant appeals, contending that the court erred (1) by denying defendant's motion for directed verdict at the close of plaintiffs' case, (2) by giving instructions to the jury on both of plaintiffs' theories of negligence, (3) by barring impeachment of one of plaintiffs' key witnesses, and (4) by submitting to the jury a cause of action for loss of the child's society. We affirm in part and reverse in part.

Brittany Barkei was born at Delnor Hospital on January 1, 1978, in a breech presentation, meaning that her posterior, rather than her head, appeared first. Dr. John Lamiot performed the delivery. The infant sustained a bruise on her buttock and a hematoma on the labia during the birth, and immediately after delivery she also experienced some degree of respiratory distress due to the nature of her birth. The infant's respiratory problems dissipated rather quickly, but on January 4 the doctors discovered a hematoma on the back of her head at the base of her skull and noticed that her left arm had become limp and immobile. Both a fracture of the cervical spine and a spinal cord injury were suspected, and Brittany was transferred to another hospital for further care.

In 1981 Brittany and her parents initiated this action against both Delnor Hospital and Dr. Lamiot and in 1987 filed an amended complaint alleging that the child had sustained brain damage and spinal cord injury as a result of defendants' negligent conduct. In addition to a *res ipsa loquitur* count of negligence, Delnor was specifically charged with dropping Brittany, allowing nonanatomical maneuvers to be performed on her, and allowing trauma to occur to her. Dr. Lamiot reached a pretrial settlement with plaintiffs, and the case against Delnor proceeded to trial.

Dr. John Lamiot, called as a witness by plaintiffs, testified that Brittany's birth had been routine and normal for a breech birth and

that he had noticed no spasticity in the newborn. The doctor stated that he had done nothing and nothing had happened during delivery to cause the infant's injuries and that he did not know of anything which occurred after she was born to cause her to be injured.

Dr. Mary Lee Holland, the first pediatrician to examine Brittany, saw the infant about 12 hours after birth and found her to be essentially free from abnormalities. The few irregularities she did note, such as the bruised buttock and labial hematoma, as well as slightly decreased muscle tone in the left leg, were perceived to be as a result of, and secondary to, the breech birth. The witness pointed out that she had made a note at the time that no paralysis was observed in the infant.

Dr. Holland examined Brittany again on January 2 and noted that she had an irritable cry, which is considered an abnormal finding and indicates something is bothering the baby. Also, the infant held her head turned to the left side. In order to rule out a fracture of the clavicle or the spine, the doctor ordered a cervical spine X ray. On January 4 Dr. Holland noted a change in the infant's condition. She found an abnormal swelling of the occipital area of Brittany's head and that the baby's left arm, which had been normal on January 2, was limp with no tone or movement. Once again the baby had an irritable cry, and Dr. Holland's assessment was that a spinal cord injury was probable. She did not, however, have any knowledge of trauma to the baby other than the history of breech delivery.

Dr. Murphy, Brittany's regular pediatrician, did not examine the baby until January 3. He did not notice any occipital swelling at that time but did find the baby to be irritable. On January 4, after discovering some swelling between the baby's upper throat and spine and determining that there might be a fracture of the infant's cervical spine, Dr. Murphy had her transferred to Loyola University Hospital. The doctor testified that, as far as he knew, he had not injured Brittany when he examined her.

Nurse Schulz, who had assisted Dr. Lamiot at Brittany's delivery, testified that she had no knowledge of how the infant received any trauma to her head. The witness also indicated that if a child had sustained a head injury during or immediately after birth she would have noted it, but there was no such notation on Brittany's chart. Kathleen and Randall Barkei, the child's parents, also testified that they did not know how the trauma to Brittany had occurred. Randall Barkei had been present in the delivery room when Brittany was born and stated that nothing unusual happened then. Both parents testified that whenever they had the baby in their physical possession a mem-

ber of the hospital nursing staff was present.

Dr. Gilbert Given, called as an expert medical witness by plaintiffs, testified that he was board-certified in pediatrics and on the staff of Children's Memorial Hospital in Chicago, Wyler's Children's Hospital, and La Rabida Children's Hospital, at the University of Chicago. He is also an associate professor of pediatrics at that university. Dr. Given testified that when one looks at all of the evidence in the case, the child's injury occurred after delivery. The occipital hematoma would have been recorded if it had been observed before January 4, 1978, but it was not. The absence of any earlier notation in the defendant hospital's records of the discovery of the hematoma at the base of the child's skull, together with the testimony of Dr. Lamiot and the delivery room nurse that the delivery had been generally uneventful, led Dr. Given to speculate that the trauma had occurred at some time after delivery. The witness noted that the hematoma was not observed until four days after the baby was born and, while it might take several hours for a hematoma to show itself, it would be very unusual and unlikely for three or four days to pass without it being noticed. On cross-examination, Dr. Given agreed that the symptoms of an injury like Brittany's could begin at the time of the trauma and continue to present themselves over an extended period of time. He also agreed that a stretching of the neck during delivery could involve the spinal cord and other nerves involved in Brittany's problem and that it was possible Brittany's head got hung up during delivery.

Plaintiffs also call Dr. Robert Eilers, who was one of the child's physicians and an expert in spinal cord and brain damage matters. Dr. Eilers testified that Brittany suffered from brain damage and spinal cord injury and that all of her injuries resulted from a trauma to the occipital area of her skull. He described trauma as forces acting upon a person and resulting in bodily injury. The hematoma which developed on the back of Brittany's head was the most immediate and obvious manifestation of the fact that she had received a trauma in that area. Although Dr. Eilers acknowledged that injuries such as Brittany's can occur during the process of being born in the breech position, he did not believe this to be so in Brittany's case because the hematoma on her head did not appear in the hospital records until the fourth day of life, and it would normally manifest itself within hours of the injury. The hematoma could have been caused by any blunt force to the occipital area, such as hitting that part of the baby's head on any object.

A third expert called by plaintiffs, Dr. James Quinlan, testified that his examination and testing of Brittany disclosed that her condi-

tion was neither genetic nor congenital in origin but was permanent and caused by a trauma to the brain.

After its motion for a directed verdict was denied, defendant offered testimony from nurses who had worked in the maternity wing of Delnor Hospital during the time Brittany was a patient there. Norma Hahn came on duty at 7 a.m. for the day shift on January 1, and Linda Kusterman worked the night shift that New Year's Day. Both nurses had cared for Brittany and made entries in her chart. Both testified essentially that they had not noticed any injury on Brittany's head during the time they were on duty, had no knowledge of how she had been injured, and that if an injury had been observed in the nursery, it would have been reported and recorded. The other nurses who testified for defendant either did not care directly for Brittany or did not work in the nursery when she was there. They did, however, corroborate that any injury to a newborn would have been immediately reported and recorded. Defendant did not call any medical witnesses to rebut the evidence offered by plaintiffs' expert witnesses.

The case was submitted to the jury with instructions on both specific negligence and *res ipsa loquitur*. Defendant did not request special interrogatories, and the jury returned a general verdict in favor of all plaintiffs.

■■ We note with some concern that defendant has included in its brief a section labeled "Ethical Consideration" in which it is suggested that this appeal may be moot. Plaintiffs state that the real purpose of this unusual section in defendant's brief is to place before this court facts relating to plaintiffs' settlement with Dr. Lamiot which are not relevant to the issues in this appeal. We are inclined to agree with that assessment. This section, which is not a part of either defendant's statement of facts or its argument, is not provided for in Supreme Court Rule 341 (107 Ill. 2d R. 341) and should not have been included in defendant's brief. Since defendant has made no proper argument on the issue of the mootness of its own appeal, the question will not be further addressed, and we do not consider the facts there alleged.

■■ Delnor contends first that the trial court erred in denying its motion for directed verdict at the close of plaintiffs' case because, it is argued, plaintiffs failed to present sufficient evidence to prove the elements of either specific negligence or negligence on the basis of *res ipsa loquitur*. A trial court may direct a verdict where all of the evidence, when viewed most favorably to the opposite party, is so overwhelmingly in favor of the movant that a contrary verdict could never

stand. (*Dyback v. Weber* (1986), 114 Ill. 2d 232, 241, 500 N.E.2d 8; *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) Measured against this standard, we find that plaintiffs' case was well able to withstand Delnor's motion.

■ We address first defendant's *res ipsa loquitur* arguments. A plaintiff invoking the doctrine of *res ipsa loquitur* bears the burden of proving all of its elements. (*Dyback,* 114 Ill. 2d at 242, 500 N.E.2d at 12.) Under *res ipsa loquitur,* the facts of the occurrence will constitute a *prima facie* showing of the defendant's negligence provided the plaintiff establishes (1) that the occurrence does not usually happen in the absence of negligence, and (2) that the defendant was in exclusive control of the instrumentality that caused the injury. (*Dyback,* 114 Ill. 2d at 242, 500 N.E.2d at 12.) The trial court must initially decide whether, as a matter of law, the *res ipsa loquitur* doctrine is applicable. (*Spidle v. Steward* (1980), 79 Ill. 2d 1, 7, 402 N.E.2d 216.) Delnor asserts that plaintiffs' evidence was not sufficient to permit the trial court to find *res ipsa loquitur* to be applicable to the facts of this case.

It is not disputed by defendant that injuries such as Brittany's do not usually occur in the absence of negligence. Nor is it contested that the injuries are the final result of some kind of trauma to Brittany's head. Defendant maintains, however, that plaintiffs did not show that the hospital had exclusive control over the instrumentality which caused the trauma. Defendant focuses on the fact that plaintiffs could not show the exact moment in which the trauma occurred or the precise act, happening or thing that actually inflicted the trauma, and argues that it could be equally reasonably inferred from the evidence that Brittany's injury was caused by Dr. Lamiot during the breech delivery. The hospital argues that *res ipsa loquitur* required plaintiffs to eliminate all possible causes of the injury other than the one alleged by them and that, because of their failure to do so, application of the doctrine improperly allowed the jury to speculate as to who caused the injuries.

We agree that mere guesswork is not a proper foundation for a finding of negligence (*Johnson v. Burlington Northern, Inc.* (1982), 107 Ill. App. 3d 130, 137, 437 N.E.2d 334); however, the doctrine of *res ipsa loquitur* does not require the absolute and conclusive proof of its elements urged by defendant. In *Spidle,* the court considered the quantity of evidence needed to establish the elements of *res ipsa loquitur* and the standard to be used by a court in determining, as a matter of law, the amount of evidence required to present a *res ipsa* theory to the jury. (*Spidle,* 79 Ill. 2d at 6-7.) Plaintiff in *Spidle* sus-

tained injury during surgery, and the issue was the sufficiency of the evidence that the injury would probably not have happened without negligence. Plaintiff's expert testified only that the injury was rare and unusual but did not discuss its incidence in the absence of a deviation from the standard of care. While the court agreed that this testimony, standing alone, was not enough to imply negligence, the court found that when combined with all the other testimony, it was sufficient under *Pedrick* to present a jury question as to the probability of negligence.

The *Spidle* court indicated that evidence making it more probable than not that an injury arises from negligence is sufficient initially, despite the fact that such evidence is not proof that the injury never happens without negligence, and to require a plaintiff to conclusively prove negligence would obviate the purposes and policy which undergird the doctrine of *res ipsa loquitur*. Those purposes and policies, as expressed by the court in *Edgar County Bank & Trust Co. v. Paris Hospital, Inc.* (1974), 57 Ill. 2d 298, 312 N.E.2d 259, are to allow proof of negligence by circumstantial evidence when direct evidence of the cause of an injury is primarily within the knowledge and control of the defendant. (*Edgar*, 57 Ill. 2d at 304-05, citing *Metz v. Central Illinois Electric & Gas Co.* (1965), 32 Ill. 2d 446, 448-49, 207 N.E.2d 305.) The *Spidle* court considered all the evidence before it and found that a reasonable person could conclude that the injury in that case more probably than not would not occur in the absence of negligence, and it was sufficient to allow the jury to infer defendant's negligence.

■ Unlike the *Spidle* court, in the present appeal we are not concerned with the question of the probability of injury in the absence of negligence. But the rationale of *Spidle* is compelling that the standard of proof applied there should also be applied here to the other element of *res ipsa loquitur*, *i.e.*, that defendant had control of the instrumentality which caused the injury. Plaintiff in *Spidle* was injured during abdominal surgery and had no knowledge of how the injury occurred, and, therefore, she needed to prove only that it was more probable than not that such an injury would not have occurred unless defendant had been negligent. Similarly, in this case the child was injured near her birth and could not possibly have had knowledge or control of any of the possible causes of the trauma she suffered and could not eliminate any of them with certainty. The hospital's role, or absence thereof, in the infant's injury was within the hospital's exclusive knowledge. Under *Edgar* this is precisely the kind of case where *res ipsa loquitur* applies. Unless allowed to rely on the doctrine, the child

would be denied the opportunity to right the wrong done to her. Under *Spidle*, we do not think it was relevant that Brittany may have been under Dr. Lamiot's control at one time and Delnor's control at another time. The question is not whether plaintiffs conclusively eliminated all other causes of the baby's injury but, rather, whether there was evidence that made it more probable than not that she was under Delnor's control when the trauma which resulted in injury was inflicted upon her. We agree with the trial court that the evidence was sufficient to meet that test.

Plaintiff's expert testimony ruled out genetic and congenital defects as the source of Brittany's problems. It showed rather that the child's brain and spinal cord injury resulted from a trauma, or force, which also caused a hematoma in the occipital area of her head. However, none of the witnesses who were present when Brittany was born were aware of any trauma inflicted on her in the delivery room. While it is clear from the evidence that certain difficulties are inherent in a breech birth, neither Dr. Lamiot nor Nurse Schulz recalled or recorded anything out of the ordinary in this particular breech birth, which was characterized by Dr. Lamiot as routine and normal for such a birth. Dr. Lamiot also testified that he did not traumatize Brittany. Although the mother, Kathleen Barkei, recalled force being used to deliver Brittany, neither her testimony nor that of her husband, Randall, reflected any awareness of an event or happening in the delivery room that could have caused the baby's trauma.

A hematoma, according to plaintiffs' expert witness, is a visible sign that trauma has occurred, and several witnesses stated that the presence of a hematoma would have been noted in the baby's chart as soon as it was observed. However, the first record of Brittany's hematoma at the base of her skull was made by Dr. Holland on January 4, after the infant had been in the nursery for approximately four days. Doctors Eilers and Givens both stated that a hematoma will show up shortly after the trauma occurs, and, since Brittany's hematoma was not observed until the fourth day of life, Dr. Givens suspected she received a trauma after she was delivered. Dr. Eilers was even more certain that the trauma did not occur during her birth but at a time closer to when the hematoma was first noticed. Dr. Holland referred to discovery of the hematoma as a change in the baby's condition since the January 2 exam and also noted that Brittany's left arm, which had become limp with no movement, had previously been normal. Dr. Holland's assessment was that there was a probable spinal cord injury.

Dr. Holland, Dr. Murphy, and Brittany's parents, all of whom han-

dled Brittany at times after she was placed in the nursery, testified that no trauma occurred to the infant when they were caring for her.

The testimony we have just summarized was tested in cross-examination where Delnor drew testimony from both of plaintiffs' medical experts to suggest that Brittany's injuries could have been caused by trauma inflicted by Dr. Lamiot during the breech delivery. Other evidence hinted that the infant could have been injured by one of the persons, other than hospital personnel, who handled the baby when she was in the nursery. Nonetheless, when viewing this record as a whole, as we must under *Pedrick*, and in a light most favorable to plaintiffs, we find that a reasonable person could conclude that, more probably than not, Brittany was injured when she was in the hospital nursery and that Delnor was in control of whatever instrumentality or activity there caused the injury. Plaintiff's evidence tended to eliminate the possibility that she was injured anywhere other than in the nursery or by anyone other than Delnor personnel. Thus, contrary to defendant's arguments, the evidence did not create an equal inference that Brittany was injured during her delivery.

■ At best, the testimony presented the jury with conflicting evidence and questions about the credibility of witnesses. Such factual disputes should be resolved by a jury, even in *res ipsa loquitur* cases. (*Spidle*, 79 Ill. 2d at 10; *Metz*, 32 Ill. 2d at 449.) Since the evidence is not overwhelmingly in favor of defendant, it cannot be said that a verdict in favor of plaintiffs could never stand, and, consequently, the trial court correctly denied Delnor's motion for directed verdict as to the count for negligence based on *res ipsa loquitur*. *Dyback*, 114 Ill. 2d at 241.

The cases upon which defendant relies do not support its arguments. In *Johnson v. Burlington Northern, Inc.* (1982), 107 Ill. App. 3d 130, 437 N.E.2d 334, the only facts indicating how the damage in question occurred pointed to a nondefendant who had control over the instrumentality after the defendants relinquished control. The court would not allow an inference to be based on the possibility that an event caused the harm when the facts were otherwise. The plaintiff in *Publication Corp. v. Chicago River & Indiana R.R. Co.* (1977), 49 Ill. App. 3d 508, 364 N.E.2d 523, clearly had control of one of the instrumentalities involved in the injury-causing event and did not present enough evidence to allow elimination of its own instrumentality as the cause of the accident. Plaintiffs in *Politakis v. Inland Steel Co.* (1983), 118 Ill. App. 3d 249, 454 N.E.2d 811, also had control of one of the instruments of the accident, and, moreover, the question of *res ipsa loquitur* was considered at the close of all the evidence, which was

closely balanced. Plaintiffs there failed to establish more than a possibility that defendant's conduct caused the accident.

Defendant's cases do not conflict with our conclusion here as in none of them did the plaintiffs show that it was more probable than not that the defendant had control of the thing or event that caused the injury, and *res ipsa loquitur* was thus properly denied in each instance. Moreover, in both *Publication Corp.* and *Politakis* the plaintiffs' control and knowledge of the facts should have enabled them to at least rule out their own fault. Plaintiffs' failure to do so destroyed the inference of negligence permitted by *res ipsa loquitur*. In contrast, Brittany had no control over the cause of her injury and no way of knowing what happened to her. While she could not completely eliminate the delivery by Dr. Lamiot as a cause, she did, however, produce enough evidence to show that she was probably injured when she was in the Delnor nursery. As pointed out by defendant, the *Johnson* court noted that probability, not speculation, is the standard to be used in determining the applicability of the doctrine of *res ipsa loquitur*. (*Johnson*, 107 Ill. App. 3d at 136.) *Johnson* relied on *Spidle* which, as we have noted, teaches that the standard does not require certainty, either.

Delnor also argues that the exclusive control requirement of the *res ipsa loquitur* doctrine is not met if the cause of injury may be attributable to any one of several persons who were not joint actors, citing *Loizzo v. St. Francis Hospital* (1984), 121 Ill. App. 3d 172, 459 N.E.2d 314. *Loizzo* involved multiple defendants who treated plaintiff for different reasons at different times and in different locations. *Res ipsa loquitur* was not applicable because the facts reflected a possibility that the injury could have been caused by a nonnamed party and plaintiff failed to present evidence to either eliminate that possibility or to contradict the defendants' evidence that they did not cause the injury. Plaintiffs' evidence in the present case did tend to eliminate third parties as causes of her injuries and to also show that Delnor was at fault. *Loizzo* is not persuasive.

A final matter pertinent to the *res ipsa loquitur* issue is Delnor's argument that the trial court should not have given a *res ipsa* instruction to the jury at the close of all the evidence. However, a party is entitled to instructions on matters supported by the evidence. (*Chambers v. Rush-Presbyterian-St. Luke's Medical Center* (1987), 155 Ill. App. 3d 458, 467, 508 N.E.2d 426.) As we have noted, plaintiffs presented sufficient evidence to allow an inference of negligence. Delnor's evidence, however, showed only that two of Brittany's nurses had done nothing to traumatize her and that Brittany's chart

did not reflect any injury, even though an injury occurring in the nursery should have been recorded by defendant's employees. The hospital presented no direct evidence to show that Brittany had been injured during delivery or when she was handled by the pediatricians or her parents. Nor did it show that Brittany was not injured in the nursery at times not accounted for by their witnesses. Finally, defendant offered nothing to contradict plaintiffs' expert medical testimony. At the close of defendant's case, plaintiffs' evidence remained sufficiently supported by the evidence to warrant the *res ipsa loquitur* instruction to the jury.

Delnor next contends that plaintiffs' case for specific negligence was also insufficient to withstand their motion for directed verdict because she did not produce any direct evidence to show that Delnor's conduct was the proximate cause of her injuries. We need not discuss this issue at length since the jury returned a general verdict and we have determined that plaintiffs' evidence was sufficient to support the jury's verdict under the doctrine of *res ipsa loquitur*. (See *Moore v. Jewel Tea Co.* (1970), 46 Ill. 2d 288, 294, 263 N.E.2d 103; *Johnson v. Hoover Water Well Service, Inc.* (1982), 108 Ill. App. 3d 994, 1004, 439 N.E.2d 1284; Ill. Rev. Stat. 1985, ch. 110, par. 2—1201(d).) Briefly, we note that the expert medical testimony established that the infant-plaintiff suffered injury when some trauma, or force, was inflicted on the back of her head. Dr. Given testified that such trauma could be caused by mishandling or dropping a child. The only places Brittany had been until discovery of her injury were the hospital delivery room and nursery. Plaintiff produced evidence which showed that the trauma occurred during the time Brittany was in the nursery and when she was in the care of hospital personnel.

■■ Even when considered with the contradictory and impeaching testimony elicited by defendant, for purposes of a directed verdict plaintiffs' evidence, if believed, was sufficient to allow a jury to reasonably conclude that a member of the Delnor staff had dropped or mishandled Brittany and that the conduct of Delnor was the proximate cause of plaintiff's injuries. A plaintiff may establish negligence through either direct or circumstantial evidence, and circumstantial evidence may be used not only in instances where the circumstances support only one logical solution, but also whenever an inference may reasonably be drawn from such evidence. (*Mort v. Walter* (1983), 98 Ill. 2d 391, 396, 457 N.E.2d 18.) Facts made certain by such inferences are to be considered when a directed verdict is sought. (*Mort,* 98 Ill. 2d at 396, 457 N.E.2d at 21.) The absence of direct evidence that Delnor dropped or mishandled Brittany did not render plaintiffs'

count for specific negligence so vulnerable as to require a directed verdict for defendant.

Furthermore, while Delnor drew inferences and presented testimony of its own, its evidence merely conflicted with that of plaintiffs and raised questions of the credibility of witnesses with regard to the issue of proximate cause. Such conflicts and questions were properly submitted to the jury for resolution. *Lee v. Grand Trunk Western R.R. Co.* (1986), 143 Ill. App. 3d 500, 512, 492 N.E.2d 1364.

Delnor's next contention of error requiring reversal is that the trial court incorrectly granted plaintiffs' motion *in limine* which barred the hospital from questioning Dr. Lamiot on cross-examination about his settlement with plaintiffs. Defendant asserts that such questioning should have been allowed as an inquiry into the witness' bias in order to test his credibility. We disagree.

■ The general rule is well established that matters concerning compromise and settlement are not admissible. (*Casson v. Nash* (1978), 74 Ill. 2d 164, 170, 384 N.E.2d 365; *Sawicki v. Kim* (1983), 112 Ill. App. 3d 641, 644, 445 N.E.2d 63; *Khatib v. McDonald* (1980), 87 Ill. App. 3d 1087, 1099-1100, 410 N.E.2d 266; *Sleck v. Butler Brothers* (1964), 53 Ill. App. 2d 7, 13, 202 N.E.2d 64.) The reason for the rule is twofold: (1) negotiations and compromises do not constitute admissions of liability and are thus irrelevant; (2) admission of evidence of settlements or attempts to settle would discourage their use, contrary to the public policy which favors settlement. (*Smiley v. Manchester Insurance & Indemnity Co.* (1977), 49 Ill. App. 3d 675, 681, 364 N.E.2d 683; *Sawicki*, 112 Ill. App. 3d at 644-45, 445 N.E.2d at 65; *Hill v. Hiles* (1941), 309 Ill. App. 321, 330, 32 N.E.2d 933.) Delnor seeks to avoid the effect of the rule by invoking the principle that it is relevant on cross-examination to inquire into the motives, bias, prejudice, or interest of a witness in order to test his credibility. While the validity of this principle is beyond dispute, it is not applicable here.

Delnor primarily relies upon *Boey v. Quaas* (1986), 139 Ill. App. 3d 1066, 487 N.E.2d 1222, where the court permitted a former defendant to testify on cross-examination about his settlement with plaintiffs. The witness had been called as an expert medical witness and testified that he believed the present defendant was negligent in his treatment of plaintiff. In holding that there had been no reversible error in the admission of testimony regarding settlement, the court focused on the jury's right to know whether the witness had agreed to testify against defendant as part of the settlement agreement so that it could accurately assess the credibility of his opinion. In contrast, in the present case, Dr. Lamiot testified under oath, in cham-

bers, that his settlement with plaintiffs did not include an agreement on his part to testify in the case against Delnor. Consequently, the kind of prejudice which concerned the court in *Boey* was not present here.

The other cases relied on by Delnor are similarly inapposite. In *Eckley v. St. Therese Hospital* (1978), 62 Ill. App. 3d 299, 379 N.E.2d 306, the court permitted cross-examination regarding a loan receipt agreement between plaintiffs and former defendants who testified for plaintiffs in the case against a remaining defendant. Under such an agreement, any amount recovered from the remaining defendant, up to the amount of the loan, is paid back to the settling defendants by plaintiff. The *Eckley* court relied on *Reese v. Chicago, Burlington & Quincy R.R. Co.* (1973), 55 Ill. 2d 356, 303 N.E.2d 382, where the use of loan receipt agreements was first approved and where it was also recognized that, under such agreements, a settling defendant has a financial interest in the successful outcome of the case since his recovery of the loan amount is contingent on plaintiff's success against the remaining defendants. Under these circumstances, according to *Reese*, it is proper to allow cross-examination of the witness regarding the settlement in order to expose his interest and avoid prejudice to the remaining defendant. The *Reese* court was careful, however, to point out that even when evidence of loan receipts is admissible, a defendant should be permitted to establish by cross-examination only that a witness knows about the existence of a loan receipt agreement and, therefore, may be biased in favor of plaintiff. In the present case the witness testified, in chambers, that his liability insurance carrier had agreed to pay the settlement sum. Absent any evidence of a loan receipt agreement, defendant cannot claim the kind of prejudice which prompted the *Reese* court to create, and the *Eckley* court to apply, the exception to the rule which bars evidence of settlement matters.

■ The bias that concerned the courts in *Eckley* and *Boey* was obvious and very extreme. There is no such blatant indication of bias on the part of Dr. Lamiot, who does not stand to gain financially in the case against Delnor and is not bound by an agreement to testify favorably for plaintiffs. Moreover, any bias Dr. Lamiot might have had worked no prejudice to Delnor; he neither gave expert medical testimony regarding Brittany's injuries or the cause thereof, nor did he give an opinion that Delnor was negligent. In fact, Dr. Lamiot's testimony is devoid of any criticism of the hospital. His account of events in the delivery room, during and after Brittany's birth, was substantially corroborated by both Nurse Schulz and the Barkeis. It is notable in the record that defendant was essentially unable to im-

peach Dr. Lamiot on the basis of his deposition, which was taken prior to the settlement, and it thus appears the doctor's testimony did not change as a result of the agreement with plaintiffs. Under these circumstances we think admission of evidence of the settlement would have unfairly shifted the jury's attention to Dr. Lamiot as the one who caused Brittany's injury. In this case, the policy barring settlement matters because they are irrelevant and prejudicial to plaintiffs outweighs the defendant's right to cross-examine regarding settlement in order to attack bias and credibility.

As plaintiffs note, Delnor's final issue, that the trial court erred in giving a jury instruction which allowed Brittany's parents to recover for loss of her society, has been settled by our supreme court in *Dralle v. Ruder* (1988), 124 Ill. 2d 61. *Dralle* holds that, on the facts of this case, plaintiff's parents did not have a cause of action. However, the jury awarded $15,000 each to Kathleen and Randall Barkei for loss of their daughter's society. In light of *Dralle*, judgment in favor of the Barkeis on their loss of society claims must be reversed.

Defendant urges that this error requires that we grant it a new trial, contending that the evidence and argument on the issue unfairly exploited the sympathy of the jury and caused jury confusion. Defendant cites language in *Dralle* which points out the difficulty of assessing damages for loss of society resulting from nonfatal injuries to a child. The language cited, however, refers to the danger of duplicate recoveries due to the overlapping facts of the child's and parents' claims, and it is this danger which our decision avoids. Reversal of the judgment for Kathleen and Randall Barkei eliminates any double recovery which may have occurred. Beyond that, we think the jury was capable of sufficiently differentiating between Brittany's damages and those of her parents to avoid influence of the parents' claim on the award to the child.

Accordingly, the judgment of the circuit court is affirmed as to all counts except for the loss of society of the child by her parents, which portion of the judgment is reversed. The cause is remanded to the trial court with directions to enter a corrected judgment.

Affirmed in part; reversed in part and remanded.

DUNN and REINHARD, JJ., concur.