ALI GUZELDERE, Special Adm'r of the Estate of Denise Guzeldere, Deceased, Plaintiff-Appellant, v. PAUL WALLIN, Defendant-Appellee.

First District (3rd Division)   No. 1—90—1716

Opinion filed April 15, 1992.

:

2

Goldberg & Goldberg and David A. Novoselsky & Associates, both of Chicago (David Novoselsky and Tammy A. Koester, of counsel), for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago (Richard J. Hickey and Joann Smith Johnston, of counsel), for appellee.

JUSTICE CERDA delivered the opinion of the court:

On April 26, 1990, a jury found in favor of defendant, Dr. Paul Wallin, and against plaintiff, Ali Guzeldere, special administrator of the estate of Denise Guzeldere, deceased. After the trial court denied all of plaintiff's post-trial motions, he filed a timely notice of appeal. On appeal, plaintiff asserts that: (1) reversible error occurred due to evidentiary rulings that were inconsistent with the trial court's rulings on plaintiff's motions *in limine*; (2) the trial court erred in refusing to discharge the jury panel after a settlement was reached with other defendants; (3) the defense counsel's closing arguments were so prejudicial that they deprived plaintiff of a fair trial; and (4) the jury's verdict was against the manifest weight of the evidence. We affirm.

The principal issue in this case is whether a motion *in limine*, which properly barred a medical expert from giving an opinion that a nurse's negligence was a cause of death, also barred the expert from testifying to whether a nurse's omissions did not give the defendant doctor the opportunity to attend to a patient.

On March 14, 1980, 4½-month-old Denise Guzeldere had a fever and difficulty breathing. At 12:15 a.m. on March 15, 1980, her father took her to the La Grange Community Hospital emergency room. Denise died at 6:15 a.m. on March 16, 1980. Her father, Ali Guzeldere, sued Dr. Paul Wallin, Nurse Eulah Draudt, and La Grange Community Hospital, among others.

After jury selection began during the trial, plaintiff reached a settlement with Nurse Draudt and the hospital. After the trial court approved the settlement, plaintiff requested that the entire jury panel be discharged because it had already been told that Nurse Draudt and the hospital were defendants. After determining that there was no evidence anyone would suffer prejudice if the jurors were not discharged, the trial court denied the motion.

The trial court then heard plaintiff's motion *in limine* requesting that Dr. Given, a defense expert witness, be barred from testifying that Nurse Draudt's failure to call Dr. Wallin when Denise's condition deteriorated was a cause of her death. Because Dr. Given's deposition did not include such testimony, the trial court ruled that he could not testify that Nurse Draudt's failure to call Dr. Wallin was a cause of Denise's death. He could testify, however, that Nurse Draudt did not call even though she should have called and that Dr. Wallin did not have the opportunity to be at the hospital when Denise's condition deteriorated because he was not contacted.

Plaintiff's counsel also made an oral motion barring defense counsel from making reference to former defendants, such as Nurse Draudt and La Grange Community Hospital, regarding their being defendants or former defendants. That motion was granted without objection from the defense counsel.

At trial, Dr. Mohommed Arain, a general surgeon who was the emergency room physician when Denise was brought in, testified that he examined Denise. After speaking with Mr. Guzeldere, he called Dr. Paul Wallin, who was Denise's pediatrician. Dr. Arain then examined Denise and ordered an X ray and a complete blood count. He made no notations in the emergency room record that there was retraction of the chest or cyanosis, which he would have done if they had existed.

Dr. Arain concluded that Denise was dehydrated and listed his diagnosis as acute bronchitis, possible pneumonia in the left lung. He did not intubate Denise, administer oxygen, place her on a monitor, or start an intravenous line because he did not feel that it was necessary. He was still in the process of evaluating the situation when Dr. Wallin, whom Dr. Arain considered to be more qualified, arrived.

Plaintiff called Dr. Paul Wallin as an adverse witness. Dr. Wallin testified that he went to the hospital at 12:30 a.m. on March 15, 1980, after being called about Denise. When he arrived at the emergency room, he talked to Dr. Arain, reviewed the record, spoke with Mr. Guzeldere, and examined Denise. Mr. Guzeldere told Dr. Wallin that Denise had vomited at 9:30 p.m., but had eaten normally earlier that day. Based on that information and the fact that Denise urinated

while she was in the emergency room, Dr. Wallin concluded that Denise did not show signs of dehydration.

Dr. Wallin reviewed the X rays, which showed atelectasis, which is less air in the lung tissue than normal, air trapping, a rotation of the heart, and bilateral pneumonia. It did not show consolidation, which exists with bacterial pneumonia. He ordered repeat X rays, which also did not show consolidation. The blood test showed an elevated white blood cell count of 17,300. Based on that count alone, Dr. Wallin stated, he could not discern whether the infection was viral or bacterial. Although he believed that the infection was bacterial in nature, he was concerned about both possible types of infection.

Dr. Wallin diagnosed Denise's condition as bronchiolitis, an inflammation or irritation of the bronchioles. He later prepared a two-page report of the history and physical, noting the following: Denise was irritable; had strong crying with good aeration; good skin color; no cyanosis (blue color); no substernal retractions; the fontanel was soft and pulsatile; she was alert; the tympanic membranes were clear; the throat was moderately inflamed; the pupils were equal and reactive to light; the chest was symmetrical; there was marked general bronchospasm with good aeration of the chest; the heart tones were normal; there was no murmur; and the neurological examination was normal. Dr. Wallin also testified that Denise's skin elasticity and mucous membranes were normal. At that time, Dr. Wallin did not consider Denise to be in a life-threatening condition.

Dr. Wallin admitted Denise at 2:35 a.m. on March 15, 1980, and gave orders directing the nursing staff to take vital signs every four hours; to push fluids to encourage her to drink; to record intake and output of fluids; to administer Quibron, a bronchodilator; to administer Ampicillin intramuscularly on admission and every six hours thereafter; and to place Denise in a high humidity tent without oxygen. He then left.

Dr. Wallin returned to the hospital between 7 and 8 a.m. on March 15, 1980. When he arrived, he reviewed the hospital records, including the nurses' notes, talked to the nurses assigned to Denise, and examined Denise. He was aware that Denise had been crying earlier, had refused a feeding, and had labored respirations. When he examined her, however, her vital signs were stable, she was afebrile, had taken in fluids, and was sleeping with good respiratory effort. Given her condition of bronchiolitis, Dr. Wallin expected Denise to experience respiratory distress and to not take fluids very easily. Therefore, he decided to continue the same course of therapy.

At 10:30 a.m., Dr. Wallin called the hospital. Upon learning that Denise had taken and retained four ounces of formula at 10 a.m., he changed her medication slightly, increasing the Quibron dose. When Dr. Wallin visited Denise around 12 noon, he observed that her color was normal. Mr. Guzeldere also testified that Denise's color was normal at that time.

Later, when Dr. Wallin visited Denise from 5 to 7:30 p.m., he reviewed the hospital chart and spoke with Denise's parents. During that time, Denise had been playing with her parents and had taken four ounces of formula and two ounces of apple juice. Dr. Wallin's examination indicated that Denise was taking fluids fairly well, her temperature was down, her respiratory efforts were easier, her color was normal, without cyanosis, and that she still had some intercostal retractions with generalized bronchospasm with some improvement. Because he concluded that Denise's condition had somewhat improved, Dr. Wallin continued the same course of therapy, but asked the nurses to try giving Denise rice or barley cereal twice daily. Dr. Wallin testified that he was not present during the resuscitation efforts at 6:10 a.m. on March 16, 1980.

Dr. Paul Chasnoff, one of plaintiff's expert witnesses, testified that, in his opinion, Dr. Wallin had deviated from the standard of care in seven ways, including that Dr. Wallin failed to (1) assess the severity of Denise's illness; (2) order arterial blood gas tests; (3) put in an intravenous line; (4) provide oxygen; (5) adequately monitor Denise; (6) leave an order for the nurse as to when he should be called; and (7) transfer Denise to the intensive care unit. As a basis for those opinions, Dr. Chasnoff stated that Denise's condition steadily deteriorated throughout her hospitalization.

On cross-examination, however, he admitted that there were major inconsistencies in her hospital chart regarding whether Denise's condition steadily deteriorated during that time. Dr. Chasnoff further testified that generally there was a low mortality rate for bronchiolitis, that Denise's condition deteriorated after Dr. Wallin last saw her, and that it was not reasonable to expect Dr. Wallin to change his course of treatment if he was not notified of changes in his patient's condition.

Dr. Chasnoff stated that Nurse Draudt should have called Dr. Wallin on March 16, 1980, at 2:45 a.m. when Denise refused her feeding and regurgitated a thick white mucous, at 3:30 a.m. when her respirations increased to 68, and at 3:45 a.m. when her respirations increased to 72. Dr. Chasnoff explained that signs of severe life-threatening illness are central cyanosis, respirations over 70, listlessness,

and apneic spells. Dr. Chasnoff opined that Denise's condition was reversible from the time she entered the emergency room until the last time Dr. Wallin saw her at 7 p.m. on March 15, 1980. When asked whether Denise would have survived if Dr. Wallin had been called and given a chance to institute appropriate therapy, plaintiff objected, and the trial court sustained the objection because Dr. Chasnoff's deposition did not contain that testimony.

Another plaintiff expert witness, Dr. Michele Monaco, testified that Dr. Wallin deviated from the standard of care in six ways, including that he failed to (1) adequately monitor Denise's heart and respiratory rates; (2) administer oxygen; (3) order an arterial blood gas test; (4) leave orders as to when he should be called; (5) start an intravenous line; and (6) transfer Denise to the intensive care unit.

On cross-examination, Dr. Monaco stated that the increases in the respiratory rate from 48 to 68 to 72 between 2:30 a.m. and 3:45 a.m. on March 16, 1980, were significant. He acknowledged that Nurse Draudt should have called Dr. Wallin when the respiratory rates increased. Even though the nurse did not call, Dr. Monaco expressed that the doctor was still directly in charge of his patient. Dr. Monaco admitted that there would have been a 96% to 99% chance of survival if Dr. Wallin were able to intervene before 5:30 a.m. on March 16, 1980.

When asked whether Nurse Draudt's failure to call Dr. Wallin caused or was a contributing cause to Denise's death, plaintiff objected, and a sidebar was held. The trial court stated that its ruling on plaintiff's motion *in limine* did not include Dr. Monaco's testimony about the nurse's standard of care. Because proximate cause was within the scope of the direct examination, the trial court allowed the witness to answer the question. Dr. Monaco responded, however, that he could not answer the question because it was too speculative.

Dr. John Dainauskas, the pathologist who wrote the final autopsy summary, testified that the cause of Denise's death was listed as bronchopneumonia, most likely bacterial pneumonia even though the postmortem cultures did not grow any bacteria.

Because former nurse Eulah Clay Draudt was unavailable to testify, her evidence deposition, taken on January 14, 1988, was read to the jury. On March 15 and 16, 1980, Nurse Draudt was employed as a registered nurse at La Grange Community Hospital on the 11 p.m. to 7 a.m. shift. She was assigned to care for Denise during that time. Nurse Draudt considered it her responsibility to assess Denise throughout her shift and to report to Dr. Wallin any changes in the physical condition that might be a risk to the patient. When the doctor was not present, Nurse Draudt stated, it was her responsibility to give Denise adequate

fluids. If she had any questions, problems, or concerns, she could report to her immediate supervisor.

During her first shift on the morning of March 15, 1980, Nurse Draudt noted that Denise's color had improved. Before Nurse Draudt came on duty at 11 p.m. the next night, Denise's temperature was 99.4 degrees; her pulse was 160; and her respiration was 48. At 2:45 a.m., Denise refused her feeding and regurgitated a thick white mucous. At that time, her respiration was 68. At 3:30 a.m., Denise's temperature was 98.6 degrees; her pulse was 156; and her respiration was 68. Fifteen minutes later, her pulse was 146 and her respiration was 72. Although Nurse Draudt considered an 8- to 10-point increase in respiration to be a drastic change, she did not contact Dr. Wallin about any change in Denise's condition from 11 p.m. on March 15, 1980, through 6 a.m. on March 16, 1980, when she found Denise unresponsive. Nurse Draudt explained that nothing she observed during that time made her feel it was necessary to contact the night supervisor or Dr. Wallin. When Denise's respirations increased during the night, she attributed the increase to the fact that Denise had vomited. At 6 a.m. on May 16, 1980, when Nurse Draudt discovered Denise not breathing, a code blue was called. The attempt to resuscitate her was unsuccessful.

Defendant called Jacqueline Ramirez, who had been a pediatric nurse at La Grange Community Hospital on the 3 to 11 p.m. shift during 1980. Nurse Ramirez explained that the pediatric nurse was the primary caretaker for the child when the doctor was not present. The nurse's assessment of the child included vital signs, respiratory rate, state of alertness, and skin elasticity. The nurse would check for dehydration by examining the skin condition, mouth, lips, diaper, and whether the child was fatigued.

Nurse Ramirez testified that she had cared for infants with bronchiolitis who had been placed in a high humidity tent. Not all infants with bronchiolitis were given an intravenous or oxygen, Ramirez stated. Based on her experience caring for children with respiratory distress, Nurse Ramirez discussed that signs of respiratory distress included labored breathing, retractions, change in color, nasal disturbances, and congestion. Respiratory distress may increase as a result of moving or changing the child. She considered an increase in a sleeping child's respiratory rate from 48 to 68 significant. If an infant had rapid respirations and wheezing, then started to grunt, as the hospital records indicated happened with Denise, Nurse Ramirez believed that the respiratory distress was becoming more serious.

If a child's condition were deteriorating, Nurse Ramirez would notify the doctor even without an order requiring her to do so. Although it

was not a regular practice in 1980 for doctors to write orders to nurses requesting them to call the doctor if the patient's condition deteriorated, Nurse Ramirez believed that it was Dr. Wallin's practice in 1980 to be contacted by the nurse if any of his patients showed signs of deterioration.

Nurse Ramirez did not observe Denise grunting from 3 to 11 p.m. on March 15, 1980. Between 5 and 7 p.m., Denise's condition improved. The fact that Denise had taken six ounces of fluid and urinated three times during the shift was a good sign.

Dr. Given, a pediatrician, was the defense's expert witness. He testified to a reasonable degree of pediatric certainty that the care and treatment Dr. Wallin gave Denise was within the standard of care. Because Denise's condition was stable and had not worsened as of 8 a.m. on March 15, 1980, Dr. Wallin's decision to not intubate her, administer oxygen, order blood gases or electrolyte studies, or to transfer her to the intensive care unit was within the standard of care. Dr. Given noted that Denise's parents acknowledged that Denise's condition had improved, that she was playing with them, and that she was aware of her environment. At that time, Denise was moving air nicely and was less distressed.

Furthermore, Dr. Given testified, the two X rays indicated that Denise's condition had not significantly changed. Dr. Given agreed with Dr. Wallin's assessment that Denise had viral pneumonia because she did not have a high fever, which is associated with bacterial pneumonia, and the blood culture was negative for bacterial growth. Given the amount of fluid voided and normal urination concentration, Dr. Given indicated that Denise was not dehydrated during her hospitalization. Dr. Given also testified that the autopsy findings were consistent with viral pneumonia or bronchiolitis.

Due to plaintiff's objection, Dr. Given was not permitted to give his opinion whether the outcome would have been different if Nurse Draudt had called Dr. Wallin when Denise's condition worsened at 2:45 a.m. on March 16, 1980. During the sidebar, an offer of proof was made that Dr. Given would testify that Dr. Wallin would have changed the course of treatment and the outcome would have been different if Nurse Draudt had called him. The trial court ruled that Dr. Given could not testify to causation, but could be asked whether Nurse Draudt should have called Dr. Wallin at specific times during her shift.

Dr. Given then testified that Dr. Wallin did not breach the standard of care by not leaving an order for the nurses to call him. That was not the standard procedure and nurses were professionals who knew when to call the doctor. Dr. Given opined that Nurse Draudt should have

called Dr. Wallin at 3:30 a.m. when Denise's pulse was 156 and her respirations were 68 while asleep. At 3:45 a.m., Nurse Draudt should have called Dr. Wallin when Denise's pulse was 146 and respiratory rate was 72 while asleep. Dr. Given explained that those signs demonstrated a drastic change in Denise's condition and implied that she was tiring, which was a serious concern.

Dr. Wallin then testified in his own defense. In addition to the evidence presented during his earlier testimony, Dr. Wallin explained that the manner in which bronchiolitis is treated depends on the extent of the disease in the particular patient. Dr. Wallin stated that he had treated several hundred children who suffered from bronchiolitis, the majority as outpatients. Dr. Wallin never knew of a child to die from bronchiolitis other than Denise.

Dr. Wallin explained that pneumonia, an inflammation of the lungs, can be either viral or bacterial in nature. Signs and symptoms of bacterial pneumonia include high fever for an extended period of time and infrequent wheezing. Although bronchiolitis may initially involve a high fever, it tapers off. On X rays, bacterial pneumonia appears consolidated while bronchiolitis appears scattered and sparse. Since Denise's X rays did not show consolidation and the blood culture did not grow bacteria, Dr. Wallin testified, it appeared that Denise did not have bacterial pneumonia. He was concerned, however, about both viral and bacterial infection. Since the antibiotic of choice for treating a four-month-old infant suffering from bronchiolitis or bacterial pneumonia was Ampicillin in 1980, Dr. Wallin ordered that drug for Denise.

Based on his physical examination of Denise, the X rays, and the blood culture, Dr. Wallin concluded that neither intubation, oxygen, blood gases, nor mechanical monitors were necessary. He determined that Denise was not in impending respiratory failure and was breathing adequately on her own.

Dr. Wallin had worked with both Nurse Draudt and Nurse Ramirez for many years at La Grange Community Hospital. He trusted them and believed they were experienced and well trained. Dr. Wallin stated that the hospital's policies and procedures did not require that he write orders to nurses asking them to call if a patient's condition significantly deteriorated. According to the hospital record, Denise first showed increased signs of fatigue and respiratory difficulties between 2:45 and 3:45 a.m. on March 16, 1980.

Dr. Wallin testified that signs of severe respiratory distress include a respiratory rate of over 70, extreme respiratory difficulty with marked retractions, nasal flaring, grunting, and poor aeration of the lungs. The hospital record showed grunting only once during the early hours of

March 15, 1980. The record did not indicate any nasal flaring or extreme respiratory difficulty. Denise had taken fluids throughout her stay, was playing peek-a-boo with her mother, and was playing with her father.

When Denise regurgitated a thick white mucous at 2:45 a.m. on March 16, 1980, Dr. Wallin stated, Nurse Draudt should have called him. At 3:30 and 3:45 a.m., when Denise's respiration rate increased to 72 and her pulse dropped to 146, Nurse Draudt should have called him. He did not receive a call until 6:10 a.m. on March 16, 1980, when he was told that a code blue had been called on Denise. Although Dr. Wallin was not allowed to testify about what he would have done for Denise if he had been called, he did testify that normally, he would go to the hospital if he was called during the night about a patient's deteriorating condition. After evaluating the situation, Dr. Wallin would consider changing the course of therapy to stop the deterioration.

After consideration of all the evidence, the jury returned a unanimous verdict in favor of Dr. Wallin. After the trial court denied plaintiff's post-trial motion, his motion for new trial, and his motion for judgment notwithstanding the verdict and a trial for damages only, plaintiff filed a timely appeal.

On appeal, plaintiff asserts that several evidentiary rulings made during the trial were reversible error because they were inconsistent with the trial court's rulings on motions *in limine*. Plaintiff claims that the record includes numerous instances of defense counsel creating inferences and innuendo to the jury that Nurse Draudt's failure to call and advise Dr. Wallin of Denise's changed condition was a cause or contributing cause of death. Many of those instances were questions to which objections were sustained. Plaintiff argues that the trial court ignored its own ruling and allowed the improper testimony, resulting in reversible error.

Plaintiff's argument has no merit. Prior to trial, the trial court ruled that Dr. Given, defendant's expert witness, could not testify that Nurse Draudt's failure to call Dr. Wallin was a cause of Denise's death. He could testify, however, that Nurse Draudt did not call even though she should have called and that Dr. Wallin did not have the opportunity to be at the hospital when Denise's condition deteriorated because he was not contacted. The trial court explained that the issue of Nurse Draudt not calling Dr. Wallin would be allowed in for the doctor's standard of care, but not for the nurse's standard of care, which was not an issue. The trial court concluded that Dr. Wallin not having the opportunity to come to the hospital because he was not called was different from the nurse's failure to call him being a cause of death.

The trial court's ruling was based on the fact that, in his deposition, Dr. Given stated that the cause of death was cardiac arrest secondary to bronchiolitis. He said nothing about third parties causing Denise's death. Since the purpose of Supreme Court Rule 220 (134 Ill. 2d R. 220) is to permit litigants to ascertain and rely on the opinions of experts retained by their adversaries, the scope of an expert's testimony at trial is limited to those opinions expressed in response to discovery. *Bart v. Union Oil Co.* (1989), 185 Ill. App. 3d 64, 69.

Since motions *in limine* cannot restrict defendant from presenting a valid defense (*Duffy v. Midlothian Country Club* (1985), 135 Ill. App. 3d 429, 436), the trial court's ruling on plaintiff's motion *in limine* was proper. It concerned Dr. Given's testimony based on his opinions expressed during discovery. It did not bar any testimony related to causation. It also was very specific that evidence could be presented that Nurse Draudt should have called Dr. Wallin when Denise's condition deteriorated and her failure to call did not give Dr. Wallin the opportunity to alter Denise's treatment. At the same time, the trial court ruled that evidence could not be presented that Nurse Draudt's failure to contact Dr. Wallin was a cause or contributing cause to Denise's death.

The trial court's evidentiary rulings regarding evidence of causation and the doctor's standard of care were proper. They conformed to its earlier rulings on plaintiff's motion *in limine*.

■ The evidence was also proper because plaintiff introduced evidence during the trial that Dr. Wallin breached the standard of care by not leaving an order for Nurse Draudt to call him if the child's condition changed. In his defense, defendant contended that the standard of care did not require him to leave Nurse Draudt a note to call him if Denise's condition deteriorated. Even without such a note, the nurse should have contacted him. Because she did not, Dr. Wallin argued, he did not have the opportunity to intervene in Denise's care. Once plaintiff introduced that evidence, he could not later complain of defendant's evidence in response. *Romanek-Golub & Co v. Anvan Hotel Corp.* (1988), 168 Ill. App. 3d 1031, 1040.

■ Plaintiff also asserts that defendant violated the trial court's ruling on his oral motion barring defense counsel from making reference to former defendants, such as Nurse Draudt and La Grange Community Hospital, regarding their being defendants or former defendants. Since plaintiff makes no argument, cites no authority, nor cites the record, he has waived that issue.

Next, plaintiff asserts that the trial court's refusal to discharge the jury panel after settlement was reached with Nurse Draudt and the hospital was reversible error. Because the entire jury panel was aware that

they had originally been defendants, plaintiff argues, he was prejudiced. Plaintiff claims that, once the jury saw that they were no longer defendants in the lawsuit, it would know that there had been a settlement, thus tainting the jury. Plaintiff's only authority is that matters concerning compromise and settlement are not admissible at trial. *Barkei v. Delnor Hospital* (1988), 176 Ill. App. 3d 681, 694.

■ Plaintiff's argument is meritless. The trial court did not err in not discharging the jury. There is no evidence in the record that the jury had any knowledge that a settlement had been reached with Nurse Draudt or the hospital. Moreover, the trial court told the jury to not speculate about why those defendants were no longer present and to decide the case on the evidence and the law. Because there was no evidence that the jury was aware of the settlement or that there was any prejudice to plaintiff, the trial court did not err in refusing to discharge the jury panel.

Although there was no error in not discharging the jury panel, it would have been better if the trial court had discharged the entire jury venire. Since only one panel had been chosen, it was Friday afternoon, and there would have been no prejudice to any party if the jury had been discharged, it would have been preferable to discharge the jury and begin jury selection anew on Monday. This was a different situation from cases where a settlement occurs with some parties during the trial.

Asserting that the defense counsel's closing arguments were unreasonable and highly prejudicial, plaintiff claims that the cumulative effect of the improper statements was so prejudicial that he was denied a fair trial. Plaintiff contends that the defense counsel erroneously changed the issue from whether Dr. Wallin's actions met the standard of care to whether Nurse Draudt's failure to call Dr. Wallin was the true cause of Denise's death. Plaintiff complains of the defense counsel's argument that Dr. Wallin should not be held liable for Denise's death since he did not have the opportunity to make a decision after Denise's condition deteriorated. Plaintiff also asserts that the defense counsel's comments concerning the qualifications of plaintiff's expert witnesses and how much they had been paid were so inflammatory and prejudicial that they deteriorated the judicial process. We disagree.

An attorney is permitted wide latitude in closing argument. For a judgment to be reversed, a closing argument must be clearly improper and prejudicial. (*In re Salmonella Litigation* (1990), 198 Ill. App. 3d 809, 820.) Comments on evidence during closing argument are proper if they are either proved by direct evidence or are a fair and reasonable inference from the facts and circumstances proven. *People v. Mullen* (1990), 141 Ill. 2d 394, 404.

■ The record establishes that the defense counsel's closing argument remarks were proper. He argued the evidence presented at trial and reasonable inferences to be drawn. The defense presented the theory that Dr. Wallin's treatment of Denise complied with the applicable standard of care. The trial court had earlier ruled that the issue of the doctor's standard of care included that Nurse Draudt did not call, she should have called, and Dr. Wallin did not have the opportunity to be at the hospital because he was not called. The trial court stated that Dr. Wallin's lack of opportunity to come to the hospital was different from the nurse's failure to call him being a cause of death.

Furthermore, the defense counsel's comments complied with the jury instructions given, including Illinois Pattern Instructions, Civil, No. 12.04 (2d ed. 1981) (hereinafter IPI Civil 2d), which was tendered by plaintiff. That instruction stated:

"More than one person may be to blame for causing an injury. If you decide that the defendant was negligent and that his negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.

However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant." IPI Civil 2d No. 12.04.

It was also proper to argue that Dr. Wallin's not being contacted about Denise's deteriorating condition had a bearing on his actions. All the experts who testified at trial agreed that Nurse Draudt should have called Dr. Wallin when Denise's condition deteriorated. Therefore, it was a reasonable inference that Dr. Wallin did not have the chance to intervene on Denise's behalf.

■ The defense counsel's comments about plaintiff's expert witnesses were also proper. Contrary to plaintiff's assertion, defense counsel did not state that plaintiff's experts were prostituting their services. He properly commented on the amount of compensation each expert witness received (*Sears v. Rutishauser* (1984), 102 Ill. 2d 402, 408), the difference in the compensation paid to plaintiff's experts and defendant's expert, and that defendant's expert was more qualified than plaintiff's experts. Those comments were very different than the comments made in *Belfield v. Coop* (1956), 8 Ill. 2d 293, which was cited by plaintiff. The *Belfield* verdict was reversed because the attorney referred to the opposing parties as "thieves," "usurpers," and "defrauders." 8 Ill. 2d at 312.

In determining whether a party has been denied a fair trial because of improper closing argument, a reviewing court gives considerable deference to the trial court because it is in a superior position to assess the accuracy and effect of counsel's statements. (*In re Salmonella*, 198 Ill. App. 3d at 820.) The defense counsel's closing argument remarks were proper since they were based on the evidence and were not contrary to the trial court's rulings on plaintiff's motion *in limine*.

■ Finally, plaintiff asserts that he is entitled to a new trial because the jury's verdict was against the manifest weight of the evidence, or, in the alternative, to a judgment notwithstanding the verdict. Plaintiff contends that the record proves that Dr. Wallin breached the standard of care and that his failures caused Denise's death.

It is the jury's function to weigh contradictory evidence, judge the credibility of the witnesses, and draw the ultimate conclusion from the facts. (*Lee v. Grand Trunk Western R.R. Co.* (1986), 143 Ill. App. 3d 500, 512.) There was ample evidence to support the jury's finding in favor of defendant. Since the verdict is not against the manifest weight of the evidence, the trial court properly denied plaintiff's motion for a new trial. *Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 310.

The trial court also properly denied plaintiff's motion for judgment notwithstanding the verdict. A judgment notwithstanding the verdict should be granted if the evidence, viewed in the light most favorable to the nonmovant, overwhelmingly favors the movant so that no contrary verdict could stand. (*Gillespie v. Chrysler Motors Corp.* (1990), 135 Ill. 2d 363, 383.) After reviewing the evidence in the light most favorable to defendant, it does not so overwhelmingly favor plaintiff that no contrary verdict based on the evidence could stand.

Based on the foregoing, the circuit court judgment is affirmed.

Affirmed.

GREIMAN, P.J., and RIZZI, J., concur.