2019 IL App (1st) 173065

FOURTH DIVISION
March 28, 2019

No. 1-17-3065

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| ERNESTINE WILSON, as Special Administrator of the Estate of BRIAN CURRY, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellant, | ) ) | 2014-L-006679 |
| v. | ) ) | Honorable |
| ERIC MOON, D.O., | ) ) | Gregory Wojkowski, Judge Presiding |
| Defendant-Appellee. | ) | |

PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justices Gordon and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    After Ernestine Wilson's 23-year-old son, Brian Curry, died from a saddle pulmonary embolism (a blood clot that blocked the large pulmonary artery straddling his lungs), Wilson sued emergency room physician Eric Moon and St. Bernard Hospital (St. Bernard), alleging that the physician negligently failed to diagnose and treat her son's condition and that the hospital was liable because of its principal-agent relationship with the doctor. Dr. Moon denied negligence and the hospital sought summary judgment on grounds that the doctor was an independent contractor. Wilson reached a settlement with the hospital, but at the trial that ensued six weeks later, the doctor called the hospital's retained expert in pulmonary medicine, who testified that Curry's signs and symptoms did not suggest a pulmonary embolism and that what

subsequently occurred was sudden and unsurvivable regardless of the doctor's efforts. The doctor's retained expert in emergency medicine testified that the doctor also complied with the standard of care for emergency medicine. The jury rejected the malpractice claim. The main issue on appeal is whether a pretrial witness disclosure that concluded, "Defendant adopts herein and reserves the right to call any Rule 213(f)(1), 213(f)(2) or 213(f)(3) witness disclosed by any party," adequately informed the plaintiff that an expert witness disclosed by a defendant who subsequently settled would be called by the remaining defendant. Wilson contends that the remaining defendant should have supplemented his witness list if he intended to call the settling defendant's witness and that his nondisclosure was prejudicial when she was unprepared for cross-examination. Wilson raises four other contentions about the scope of other witness testimony and the scope of the defendant's closing arguments.

¶ 2                                    I. BACKGROUND

¶ 3     We will summarize the evidence presented at the trial that was conducted in March 2017, and subsequently discuss the pretrial procedural history to the extent necessary to address Wilson's appeal. Wilson does not dispute that the manifest weight of trial evidence was in Dr. Moon's favor. Accordingly, we need not provide extensive detail of the witness testimony.

¶ 4     Wilson called Terrance L. Baker, M.D., as her retained expert in emergency medicine. Dr. Baker testified that he earned his medical degree in 1984, and became board certified in emergency medicine, family practice, geriatrics, and forensic medicine. Dr. Baker had 30 years' experience as a physician and was working in Good Samaritan Hospital's emergency department in 2012.

¶ 5     Dr. Baker testified that deep veins are the ones inside the arms, legs, and body that return blood from the feet and hands to the heart; a deep vein thrombosis (DVT) is a blood clot in one

of those deep veins; and a pulmonary embolism (PE) occurs when one of those abnormal blood clots travels to the lungs. Dr. Baker reviewed the paramedics' report, the emergency room records, the autopsy report and death certificate, and the deposition testimony of persons involved in Curry's medical care and this lawsuit. In Dr. Baker's opinion, when Curry arrived at the emergency room, he had the signs and symptoms of a blood clot in his left leg and other clots in the periphery or outer margins of his lungs, including the sudden onset of shortness of breath, tightness in his chest and throat, a cough, and his eyes rolling back in his head. In Dr. Baker's opinion, Dr. Moon breached the standard of care for emergency medicine by not ordering a chest CT scan (a form of X-ray) to rule out peripheral PE and by discharging Curry prior to ruling out PE. The standard of care also required Dr. Moon to start Heparin[1] until he could see the results of the chest scan, *i.e.*, to start Heparin around 12:35 or 12:40 a.m., when Dr. Moon started ordering diagnostic tests. According to Dr. Baker, Heparin would have prevented the clot in Curry's left leg from growing and stabilized it so that it would not move to his lungs. Curry's electrocardiogram (EKG)—which showed a heart rate of 122 beats per minute, instead of 60 to 100, and a strain at the top and bottom of his heart—was also consistent with PE. However, Curry felt better while in the emergency room because he was provided with Tylenol, oxygen, fluids, and rest—which allowed his body to naturally dissolve the small clots in his lungs—and because his young heart and lungs had reserve that allowed his body to compensate when it was injured. According to Dr. Baker, when Curry was discharged at 3:05 a.m. with a diagnosis of bronchitis, his movements caused blood clots to break loose and travel to his heart, where they were pumped to his lungs and closed off circulation. Curry was able to return to emergency room before going into cardiac arrest. The standard of care required that he be given tissue

---

[1]Another witness, Dr. Overton, testified that Heparin is a drug that stops the clotting process so that existing clots do not grow larger and new clots are not formed.

plasminogen activator (tPA) almost immediately upon his return to the emergency room and collapse at 3:45 a.m.[2] It was also Dr. Baker's opinion, that Curry probably would have survived if he had been given Heparin and oxygen at 3:45 a.m.

¶ 6      On cross-examination, Dr. Baker said his only board certification was in family practice, not emergency medicine, and he was not eligible for board certification in emergency medicine because he had not completed a residency in that specialty. Dr. Baker had never written any articles or performed studies regarding PE or emergency medicine, and he had never been invited to present to the field of emergency room professionals. Wilson was paying Dr. Baker $500 per hour. Dr. Baker was splitting his workweek between an emergency room, a family practice office, a rehab facility, and a tattoo removal facility. Dr. Baker acknowledged that the paramedics' report did not document any shortness of breath, difficulty breathing, chest pain, leg pain, or throat pain and that the report indicated Curry was ambulatory when the paramedics arrived and had walked to the ambulance. The paramedics were told that Curry may have suffered a seizure, but he was "symptom free" when the paramedics were on the scene and all his vital signs remained normal. Similarly, in the emergency room, Curry did not complain of shortness of breath or chest pain, other than saying that he had those problems historically. While he was there, his blood pressure was "very good," his respiration rate remained "well within normal," and his oxygen saturation levels "[were] all very good and above normal." Dr. Baker acknowledged that an emergency room physician would be managing multiple patients at once and that standard practice was to perform a physical exam, take the patient's history, and then check back from time to time to see if test results were back and how the patient was responding to any treatment. The doctor would not note every time he or she returned to check. The standard

_____

[2]Dr. Moon testified that tPA is a naturally occurring substance that is present in the body at all times and helps break down the clots which are routinely occurring.

of care required charting only significant events such as the return of lab results or a further physical exam. All of Curry's vital signs were continuously monitored by equipment, and the records indicated he did not breathe at a faster rate to compensate for the decrease in oxygen that would be caused by PE. Dr. Baker acknowledged that Curry's mother testified at her deposition that he had chronic shortness of breath and chest pain and that if he would sit and rest for a few minutes, he would be fine. Curry weighed 300 pounds, was not athletic, and would experience chest pain and become winded just by taking a walk around the block. Dr. Baker conceded that shortness of breath is a common complaint in the emergency room and that, even if it were combined with chest pain, it would not justify ordering a CT scan or administering Heparin. A CT scan or Heparin would be justified only if there was "a high suspicion" of PE. Dr. Baker also conceded that the standard of care for a patient who was stable required waiting for test results to confirm normal kidney function; otherwise, the kidneys would be damaged by the contrast dye used in a CT scan. The lab samples taken at 1:20 a.m. were not returned until 2:06 a.m. Furthermore, even if a chest CT had been ordered, it would not have shown the DVT in Curry's left leg. Dr. Baker acknowledged that he did not know how long it would take for a CT scan to be performed and then interpreted by a radiologist at St. Bernard. Dr. Baker acknowledged that he lacked enough information to estimate how long it would have taken for tPA to break down Curry's DVT or PE. Heparin only stabilizes a clot, it does not break it down. Dr. Baker agreed that tPA was not appropriate until 3:45 a.m., when Curry returned to the emergency room. Dr. Baker agreed that Curry's seizure upon his return at 3:45 a.m. could have been caused by a brain bleed and that tPA was contraindicated in that circumstance because significantly thinning his blood could cause his death. Curry's EKG showed some abnormalities, which Dr. Baker agreed could be due to "a variety of factors" unrelated to PE. Curry's symptoms of a sore throat, cough,

fever, nasal congestion, elevated white blood cell count, and elevated neutrophils were all consistent with Dr. Moon's diagnosis of bronchitis.[3]

¶ 7     According to Dr. Baker, Curry developed three different issues: (1) a large DVT in his left calf, (2) peripheral PE in his outer lungs, and (3) the saddle PE which occurred when the large DVT in his left leg broke off seconds to minutes before his cardiac arrest. Curry's sedentary lifestyle, obesity, and smoking were significant contributing factors to his DVT. Dr. Baker agreed that Curry's death was caused by the saddle PE and not the small peripheral emboli in his lungs. Dr. Baker testified that the medical examiner estimated that the leg clot had been between 4 and 10 centimeters in length. Dr. Baker agreed with the autopsy report, which indicated that Curry suffered the massive saddle PE just seconds or minutes prior to going into cardiac arrest and that the saddle PE was not survivable. Dr. Baker further testified that when Dr. Moon and the medical examiner examined Curry's legs, they noted they were normal and symmetrical, and the medical examiner was able to find the clot in Curry's left leg only by carefully opening it to get to the deep veins.

¶ 8     Chicago Fire Department paramedic Dante Butler testified that he was dispatched to Curry's home due to a report of shortness of breath, but Curry said that earlier it felt like he was going to have a seizure. Curry also said he was feeling better. Butler's exam on the scene confirmed that Curry was breathing normally, did not have a seizure, was not in a post-seizure state, and was ambulatory. Curry's vital signs were normal and his Glascow Coma Scale (GCS) score, which was a way of assessing his alertness and orientation, was a perfect score of 15.

---

[3]Neutrophils are a type of white blood cell that fight bacterial infection, although their number may also increase in response to physical or emotional stress. Lynne Eldridge, *Neutrophils Function and Abnormal Results*, Verywell Health (Sept. 1, 2018), https://www.verywellhealth.com/what-are-neutrophils-p2-2249134 (last visited Mar. 7, 2019) [https://perma.cc/2WG8-BYWX].

Curry was transported to the nearest hospital.

¶ 9 Catherine James, R.N., testified that she had been a registered nurse for 26 years and started working the St. Bernard emergency room in 2011. After nurse James assessed Curry, he was examined by the triage nurse, and then Dr. Moon followed his usual practice of examining his patient immediately. Curry's EKG showed a slightly elevated heart rate of 122 at one point. If this rate had been persistent, it would have indicated PE, but he did not always maintain this rate while in the emergency room. In nurse James's experience, a patient with a fluctuating heart rate while at rest does not have PE. Curry was attached to a machine that continuously monitored his heart, but his chart did not include any notes between 1 a.m. and 3:05 a.m., which was consistent with the hospital's protocol of charting vital signs every two to three hours. Nurse James saw Dr. Moon recheck Curry's lungs, oxygen saturation, and vital signs before deciding to discharge him after his temperature was down and his vital signs were stable. When nurse James took the written discharge instructions to Curry, he confirmed that he was feeling better and did not have pain or shortness of breath and was ready to go home. Nurse James observed that Curry did not have any difficulty putting on his clothing and that he left the emergency room with his mother. Curry, however, returned to the emergency room (walking, not running), sat down, and then passed out. He was immediately taken to the trauma room and given cardiopulmonary resuscitation (CPR).

¶ 10 Wilson called Dr. Moon as an adverse witness. Dr. Moon earned a bachelor's degree in zoology and a master's degree in physiology, before attending four years of medical school and earning an Illinois physician's license upon graduation in 2000. After that, Dr. Moon completed four additional years of emergency care residency in Chicago hospitals and became board certified in emergency medicine. Dr. Moon had worked in the emergency room for 13 years and

treated "many" patients who were experiencing DVT and PE.

¶ 11    After considering the paramedics' report, taking Curry's history, and performing a physical exam, Dr. Moon ordered a chest X-ray and observed slight abnormalities in the images that were suggestive of pneumonia, although a radiologist who subsequently reviewed the film concluded Curry's lungs were normal. Curry was obese and had been playing video games for hours before he started feeling ill. Obesity, however, was "very low" on the risk scale for DVT and PE, Curry's sedentary lifestyle was only an insignificant risk factor, and gaming was not a risk factor at all. Dr. Moon denied that the standard of care required him to "think of DVT and PE when [Curry] arrived." Major risk factors included malignancy, pregnancy, hormone use, birth control, anabolic steroids, and being immobile for more than 48 hours (bedridden). PEs were essentially nonexistent in people below the age of 18 and were unlikely in a 23-year-old. Almost all people suffering from PEs were over the age of 40, and most were over the age of 50.

¶ 12    Dr. Moon documented that Curry complained of throat pain and difficulty breathing and that his chief complaint was that he had suspected he was going to have a seizure (he had some past history of seizures). However, when Dr. Moon first examined him, Curry said he did not need to be there, wanted to go home, and his mother was coming to pick him up. Because people are disoriented or confused after a seizure, Dr. Moon called Curry's mother to ask her why Curry came to the emergency room. Curry's mother said he did not have a seizure but he clutched his chest, complained of shortness of breath, and his eyes rolled back in his head. When a patient reports shortness of breath (which Curry did not experience in the emergency room), Dr. Moon will consider cardiac problems, PE, pneumonia, bronchitis, asthma, anemia, and other issues. Dr. Moon again denied that being sedentary or in bed for more than nine hours would be risk factor for DVT and said that he frequently slept for nine hours at a time without experiencing DVT. Dr.

Moon charted that he checked for DVT by inspecting Curry's legs for swelling and symmetry and palpating them for pain or tenderness and that Curry's extremities appeared to be normal. Dr. Moon spent 10 minutes performing this initial physical exam. Curry's symptoms prior to arriving in the ambulance "may well have been" caused by PE. Dr. Moon admitted that he now believes Curry was experiencing a thrombosis or DVT while in the emergency room, which Dr. Moon did not diagnose, in addition to the bronchitis, which Dr. Moon did diagnose. Definitive diagnosis of PE would have required a CT scan, but the standard of care did not require a chest CT scan in Curry's case, and Dr. Moon did not order one. Dr. Moon ordered blood work, in part to determine whether Curry's kidneys were functioning normally, in case Curry needed a CT scan. Dr. Moon also ordered an EKG, and received results at 1:01 a.m. The EKG showed that Curry's heart rate was more than 122 and in an abnormal rhythm (he was in tachycardia) and that the ST segment of the test was elevated. A heart rate of 122 is a symptom of "many things," including PE. If Dr. Moon had diagnosed PE then, he would have ordered Heparin and hospitalization, which would have helped Curry's body break down the clot but would not have necessarily saved his life. Dr. Moon considered Curry's case to be an anomaly. Dr. Moon diagnosed Curry with bronchitis (lower respiratory tract inflammation caused by infection), prescribed two antibiotics, and discharged Curry at 3:05 a.m. Curry returned at 3:45 a.m. and had a seizure. He was given Heparin and he received tPA at 4:10 a.m. and at 4:22 a.m. The substance tPA is naturally occurring, present in the body at all times, and helps break down clots that are routinely occurring. As a medication, tPA is extremely concentrated and dangerous and is administered only under "extremely strict circumstances" because it will kill up to 10% of its recipients.

¶ 13    On redirect examination, Dr. Moon denied that Curry's elevated white blood cell count

and elevated neutrophils were indicative of DVT rather than an infection. Curry's symptoms in the emergency room were not reasons to order an ultrasound or CT scan. The autopsy found small emboli in the periphery of Curry's lungs, but this was not the cause of the symptoms he experienced before calling for the ambulance.

¶ 14    Wilson testified that her son, who lived with her in Chicago, had stayed in his room all day on Saturday, November 10, 2012, playing video games. That night, Curry started to walk to the gas station to purchase some juice but then suddenly returned home holding his chest, saying that he was having chest pains and difficulty breathing, and that she should call 911. He left in the ambulance just before midnight, and she followed on public transportation. While she was still enroute to St. Bernard, Dr. Moon called her to ask why Curry was in the emergency room and whether he had a history of seizures. Wilson could not recall her answer. While she was at the hospital, she noticed that her son was unusually quiet and answering questions slowly. She signed the discharge instructions because her son was not talking and did not want to do anything. He was slow to get out of the bed, he had difficulty putting on his shoes and shirt, and she could tell that he was still having problems. Wilson was the only one, however, who observed that when he bent over to put on his shoes, his breathing worsened. She had been asking repeatedly whether he was ready to leave and finally he answered that he was ready. When they started to walk toward the train station, Curry began "crying and hollering and screaming" and then ran back to the emergency room. He went back to the same bed, laid down, and collapsed, and then the doctor ran in to help. Wilson also testified about the emotional difficulty she has experienced since her son's death and said she felt "lost in this world" without him.

¶ 15    On cross-examination, Wilson said that her son attended one year of high school and

subsequently (between almost age 16 and age 23) stayed home watching TV, playing video games, and listening to music. He was not athletic, and as time went by, he went outdoors less and less. He smoked and had shortness of breath and chest pain. When he had trouble breathing in 2007 (approximately five years before his death), he had been taken by ambulance to the University of Chicago Medical Center, but testing indicated he was "fine" and he was released that same day. He had also been taken to the hospital once when he was younger for a seizure that occurred when he did not take his seizure medication. Curry's weight increased with his inactivity. She observed that his physical condition was deteriorating and that it was increasingly difficult for him to do things that required bending down. However, when the paramedics arrived, he was alert and he walked to the ambulance and entered it by himself. Wilson denied that she thought Curry was having a seizure when she called 911, but then acknowledged that she was contradicting her deposition testimony. Wilson had testified that she signed Curry's discharge instructions, but when shown a copy of his instructions, she acknowledged that her memory was incorrect and that he signed them himself. Wilson had noticed that Curry had difficulty breathing while he was putting his shoes on, but she did not report this to the hospital staff because he was just breathing hard. Wilson had testified that Curry felt terrible when he was being discharged, but when asked whether she had gone to get a nurse or physician, Wilson replied that she had not because "[h]e didn't say it right away."

¶ 16 Wilson rested after tendering statistical information about Curry's and Wilson's life expectancy.

¶ 17 When the trial resumed on the morning of March 10, 2017, Wilson moved to bar Victor F. Tapson, M.D., from testifying for Dr. Moon on grounds that Dr. Tapson would be cumulative of David T. Overton, M.D., and because Wilson's attorney was unprepared for cross-

examination. Dr. Moon's attorney told Wilson's attorney on the first day of trial, March 1, 2017, that Dr. Tapson was coming to testify. However, Wilson's attorney had been preparing for trial under his assumption that Dr. Tapson was no longer a witness once the hospital settled and Dr. Moon did not update his Rule 213 (Ill. S. Ct. R. 213 (eff. Jan. 1, 2007)) disclosures to adopt Dr. Tapson. Wilson's attorney had not sent a Rule 237 (Ill. S. Ct. R. 237 (eff. July 1, 2007)) notice to produce documents so that he could cross-examine Dr. Tapson about "how much he's charging to testify, what arrangements they made for him to come, [and] what information they gave to him." Dr. Moon's attorney responded that the lawyers had numerous discussions during the trial without Wilson's attorney seeking information about Dr. Tapson, there was no written contract or any other documents that could have been produced, Dr. Moon's Rule 213 witness disclosure had adopted everyone's experts, and Dr. Tapson's testimony would be consistent with his deposition and the hospital's Rule 213 disclosure. Wilson's attorney then asked for an hour or less to depose Dr. Tapson regarding "what [these lawyers] told him, what they gave him." The trial court then indicated that Dr. Tapson's testimony would be limited to the existing Rule 213 disclosures and noted that the only other information Wilson was asking for was Dr. Tapson's fee arrangement with Dr. Moon. The court ordered Dr. Moon's attorney to obtain the financial information from Dr. Tapson and produce it in writing that morning. Then the court denied Wilson's motion to bar Dr. Tapson. When Wilson's attorney said he intended to show the jury that Dr. Tapson had been biased by the retainer he received from the hospital, the court responded that no information about a settling party could be disclosed to the jury. This was one of several instances during the trial when Wilson's attorney said he wanted to bring out that Dr. Tapson had a connection to the hospital's defense team and that the trial court responded that counsel was proposing something that was inappropriate.

¶ 18    Dr. Moon then called Dr. Tapson, who is a specialist in PE. Dr. Tapson graduated from medical school in 1982, completed a four-year residency in internal medicine, took three additional years of training in pulmonary medicine and critical care medicine, and then passed the exams for board certification in pulmonary medicine and internal medicine. Between 1989 and 2013, Dr. Tapson was on the faculty of Duke University, as the head of the pulmonary vascular disease department, and taught pulmonary medicine classes. Dr. Tapson also ran the pulmonary clinic, where he regularly lectured about PE and orally quizzed interns and fellows as they were examining patients in the intensive care and pulmonary wards. Beginning in the early 1990s, Dr. Tapson was researching both the diagnosis of PE and its treatment, as he tried to break up clots faster, make better and safer use of blood thinners, effectively diagnose blood clots in the lungs, and use different diagnostic tools such as magnetic resonance imaging (MRI), CT, and ventilation perfusion scanning. Dr. Tapson headed up a committee of the American Thoracic Society in the mid-1990s and was subsequently involved with the American College of Chest Physicians. With the first group, he developed guidelines published in 1995 for diagnosing PE. With the second group, he developed guidelines published in 1998, 2001, and 2004, for treating PE. Despite the national name, these guidelines were used worldwide. For the past 20 years, Dr. Tapson has attended meetings of the American Thoracic Society, which is a lung doctors' group, and he is scheduled to present an abstract (research) at the upcoming meeting so that his research can be commented upon by the members and likely become published in a medical journal. He regularly attends worldwide meetings of the American Thoracic Society, the American College of Chest Physicians, and the World College of Physicians to learn about the latest research in lung medicine. Dr. Tapson sometimes speaks at the meetings. He has spoken at other medical schools, hospitals, and conferences on the topic of PE and has published about 230

articles in peer-reviewed medical journals. Up to 150 of those articles were about PE, while others were about lung transplantation and pulmonary hypertension. Dr. Tapson is the author of PE textbooks and has reviewed entire medical textbooks before publication. After retiring in 2013 from Duke University, which ran a 1200-bed hospital, Dr. Tapson was invited to do essentially the same pulmonology patient care and research at Cedars-Sinai Medical Center, in Los Angeles, California, where Dr. Tapson has started a new PE response clinic that treats 200 PE patients at a time, he does "rounds" in the intensive care unit, and he consults as requested.

¶ 19   Dr. Tapson was charging $500 per hour and estimated that he had spent 15 to 18 hours becoming familiar with Curry's case. Dr. Tapson would expect there to be some symptoms if Curry had DVT, which had already broken off and were causing PE. There was, however, nothing in the paramedics' report, the paramedic's testimony, or the hospital records indicating that Curry complained of any problem with his legs. Further, there was no evidence of swelling or physical deformity, which might have been clues of DVT. His temperature of 101.5 degrees was very unusual with PE and would lead a physician to a different diagnosis. Curry also had a slightly fast heart rate (tachycardia), but this came down subsequently when his temperature came down. Curry displayed no symptoms of PE, and "there was nothing here to suggest it should have been looked for." What he had mainly noted at home was that he felt he was going to have a seizure and that his mother said his eyes rolled back, so he had been brought in for evaluation. Dr. Tapson said it was "difficult," "tough," and "tricky" to diagnose PE and that many of the 100,000 patients who die each year in the United States due to PE go undiagnosed until after death.

¶ 20   Heparin would not be administered to someone who did not have symptoms requiring a blood thinner. In Dr. Tapson's opinion, if by chance Heparin had been administered between

midnight and 3:30 a.m., it would have made no difference, as it takes roughly 24 hours for Heparin to become effective at thinning the blood and preventing a clot from becoming larger. After that, it takes weeks for the body to break down a clot, according to Dr. Tapson. When CT scans are performed after a month of treatment for PE, about half of patients still have the clot. Even if a chest CT had been ordered, it would not have shown the looming problem in Curry's calf. Also, once the blood test came back at 2:06 a.m., confirming that Curry's kidneys were functioning normally, even if a CT scan had been done "really quickly," it would have taken another hour to perform the test and have the results read by a radiologist. "[I]t was, unfortunately, too short a period of time." In Dr. Tapson's opinion, "[t]here was not enough time for anything to be done [to prevent Curry's death]." As for the suggestion that Curry should have been given tPA earlier than 4:10 a.m. and 4:22 a.m., tPA is a difficult and dangerous drug, which dissipates quickly, so it is recommended that tPA be given gradually over the course of hours so that it has a chance to work. Prior to the "Code Blue," Curry was stable, and there was no indication that tPA should be administered. Even if he had a proven PE before the "Code Blue," it would not have been appropriate to have given him tPA because he was stable. Dr. Tapson stated that tPA is "dangerous" and should be given only "in the most extreme circumstance," and not just because the patient's heart rate is fast, the patient's blood pressure is on the low side, the patient's breathing is fast, or the patient's oxygen level is low. By the time Curry received the tPA, his heart had already stopped. CPR efforts are not capable of quickly circulating blood, which meant the tPA could not enter the clot and have effect. Dr. Tapson, however, agreed with Dr. Moon's decision to at least try tPA "as a last-ditch chance." Dr. Moon had testified that he initially considered PE to be a potential cause of Curry's previous history of shortness of breath, which in Dr. Tapson thought was "insightful" of Dr. Moon because too often PE is not even

considered. However, when Curry did not have symptoms of PE, there was no reason to continue considering that diagnosis. In Dr. Tapson's opinion, there was no medication, no treatment, and nothing that could have been done before 3:30 a.m. that would have saved Curry's life. Based on the medical records, Dr. Tapson thought it was "very appropriate" to discharge Curry.

¶ 21    On cross-examination, Dr. Tapson denied that he would have prescribed Heparin and hospitalization, as some emergency room patients are sent home with treatment for PE and Dr. Tapson was in the midst of a medical study about this approach. When PE is diagnosed and patients are then admitted and put on blood thinner, 96% to 98% of them survive. Dr. Tapson agreed that Curry had the DVT in his left leg when he arrived in the emergency room and when he was discharged. PE can be detected with a CT scan, and Curry was discharged without receiving one.

¶ 22    On redirect, Dr. Tapson said, "For sudden shortness of breath to occur and go after two minutes and not come back is very unusual in [PE]. It's not what you would expect." Generally speaking, once PE sets in and produces symptoms, "those symptoms are going to stay." When asked if there had been signs or symptoms in the medical records or any of the testimony that required that Curry receive a chest CT, Dr. Tapson answered:

> "No. It's a difficult case. That's why I'm going to continue to do research in this area because of people like Brian Curry. We don't want people like that to die. There was nothing that could have been done. CT was not indicated because [he didn't have any symptoms or signs of PE]. He had a fever of 101.5. If anything, that leads you away from [PE]. It's a tough case. I don't know anyone that would have made a diagnosis of [PE]."

¶ 23    When asked why he had testified in numerous cases over the years, Dr. Tapson answered, "Because I've seen thousands of [PE] cases over the years. It's my focus. *** I don't mean to

talk myself up, if you will. But this is what I do. *** [T]his particular disease is what I've been studying for 25 years and think about all the time." Dr. Tapson said that Dr. Moon's care complied with what Dr. Tapson expected and that Dr. Moon did nothing to cause Curry's death.

¶ 24   Out of the presence of the jury, Wilson made an offer of proof by questioning Dr. Tapson. Dr. Tapson testified that he was initially hired by "Lowis & Gellen, Michael Code, and Simon Hill" to give opinions in this case. When Dr. Tapson was shown attorney Hill's Rule 213 witness disclosures, Dr. Tapson acknowledged that the document indicated Mr. Hill had intended to call Dr. Tapson, Dr. Cichon, and Dr. Rhodes. Dr. Tapson had exchanged "numerous" e-mails with Mr. Hill, but could not recall how many times they spoke about the case. Dr. Tapson agreed that his retainer from Mr. Hill had probably been $2000. Dr. Tapson had spent probably 15 to 18 hours becoming familiar with the case and would be billing for two days of trial testimony, airfare, and lodging. Dr. Tapson could not recall who sent him the materials he reviewed for the deposition, but acknowledged that the transcript of his deposition indicated that Mr. Hill had been the first to call him about the case. Dr. Tapson did not know whether he exchanged any e-mails with Dr. Moon's attorney, Mr. Vogt, but did recall talking by phone. Dr. Tapson denied that Mr. Vogt "provided any information regarding his theory [of the case]" and Dr. Tapson said "I don't care about anyone else's theory. *** I know my theory." Dr. Tapson denied obtaining any advice from Mr. Vogt about the facts of the case, and Dr. Tapson testified that he got the facts from the medical records. Dr. Tapson denied reading Dr. Overton's deposition, at which point Mr. Vogt denied sending Dr. Overton's deposition to Dr. Tapson. Dr. Tapson added, "I don't know anything about Dr. Overton. I don't know or care what he said. I know what I said and believe."

¶ 25   David T. Overton, M.D, testified that his undergraduate degree was in biochemistry. He

completed medical school in 1978, which was followed by residencies in internal medicine and emergency medicine and the exams necessary to earn board certifications in both specialties. After his training, Dr. Overton spent eight years in Detroit, Michigan, where he helped start an emergency medicine residency program and practiced in an emergency room. Then he started an emergency medicine academic unit and an emergency medicine residency program in Kalamazoo, Michigan. In Kalamazoo, Dr. Overton continued to practice emergency medicine at two different teaching hospitals. For 15 years, he was the chair of emergency medicine at either Western Michigan or Michigan State, and he had spent the past 20 years as Western Michigan's associate dean for graduate medical education. Thus, Dr. Overton's entire career involved teaching medicine at the medical student, resident, and continuing education levels. For almost 30 years, Dr. Overton has been involved in organizations that enhance emergency medicine care, including the American College of Emergency Physicians, the Society for Academic Emergency Medicine, the American Board of Emergency Medicine, and the Accreditation Council for Graduate Medical Education. Dr. Overton is an oral examiner for doctors to become board certified in emergency medicine, and he serves on a committee that determines whether the various emergency residency programs in the United States will be accredited. Dr. Overton has also set up and reviewed emergency medicine residency programs in Italy, China, Qatar, and the United Arab Emirates. Dr. Overton has received awards within the field of emergency medicine, such as being inducted to the Alpha Omega Alpha Honor Medical Society. Dr. Overton was the author of at least 65 articles in peer-reviewed medical journals, the editor of chapters in medical textbooks, one of the associate editors for Annals of Emergency Medicine, and a speaker before other emergency medicine professionals at least 40 times.

¶ 26     After Dr. Moon took Curry's medical history and performed a physical exam, Dr. Moon

called Curry's mother, an indication that Dr. Moon was "being careful and going the extra mile" to obtain additional history that a parent might know and a young patient might not even be aware of, according to Dr. Overton. Dr. Moon's medical history and physical exam of Curry complied with the standard of care for an emergency room physician, Dr. Overton stated. Although Dr. Moon had initially considered and removed PE as a possible diagnosis, Dr. Overton opined that this was appropriate. Because tPA is "an extraordinarily dangerous drug," even "a lot more dangerous than Heparin" and has "a good chance of causing damage," "a physician needs to be very sure there is a reason to prescribe tPA." Doctors are supposed to first do no harm. It would have been a violation of the standard of care to prescribe tPA during Curry's initial stay in the emergency room. When Curry's heart arrested, he was given multiple medications, including tPA, which was appropriate because Dr. Moon would have strongly considered PE to be the reason for Curry's cardiac arrest and because at that point the risk-to-benefit weighed in favor of giving tPA. In Dr. Overton's opinion, Dr. Moon's treatment of Curry complied with the standard of care for an emergency medicine physician. Dr. Moon did not do or fail to do anything that caused the DVT to develop in Curry's leg, break off and travel to his pulmonary trunk, rest at the saddle location, or cause his death. The DVT broke off and traveled to the saddle point within seconds to a minute or so before Curry had the seizure in the emergency room. In Dr. Overton's opinion, there was no prior indication of its presence, there was nothing that could have been done to reduce its size, and there was nothing that could have been done to prevent it from breaking off.

¶ 27    On cross-examination, Dr. Overton disagreed that the standard of care for an emergency physician required that he or she diagnose a DVT before discharging a patient because, in Dr. Overton's opinion, there would first need to be some symptoms that suggested DVT. Dr. Moon

had not knowingly discharged Curry with a life-threatening condition. Dr. Overton disagreed that if Dr. Moon had ordered a chest CT scan, it would have revealed the small peripheral PEs that the autopsy found in Curry's lungs. He explained that the autopsy did not indicate the timing of those PEs, and they "could have occurred just at the same time that the saddle embolus broke apart." Dr. Overton agreed that if Curry had been given tPA at 3:45 a.m. when he returned to the emergency room instead of at 4:10 a.m., then Curry might have survived, but "[c]learly the standard of care would have prevented [an emergency room physician] from giving it [that early]." Curry's EKG recorded tachycardia at one point (rapid heart rate while at rest) and Dr. Overton testified, "99 percent of the time, [the cause is] not going to be PE, it's going to be something else, like bronchitis or pneumonia or something else." Also: "There's multiple things that can cause tachycardia. PE is a very rare one. There's many other things that are much more likely. The fact that the tachycardia spontaneously went away would very much lead you against it being PE, because if it was PE, why did it go away?" As for whether there were "other abnormal findings" on Curry's EKG results, Dr. Overton said there were "non-specific STT wave changes on the EKG," which were not "remotely suggestive of PE" and were just "incidental findings that have nothing to do with this at all."

¶ 28      After closing arguments, the jury deliberated and returned a verdict in favor of Dr. Moon.

¶ 29                                    II. ANALYSIS

¶ 30      This brings us to Wilson's first argument for reversal of the judgment. Wilson contends it was error to allow Dr. Moon to call an undisclosed 213(f)(3) (Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2007)) expert witness, Dr. Tapson, the pulmonologist, in that Dr. Tapson was originally retained by the hospital as its Rule 213(f)(3) expert witness and accordingly was listed on the hospital's witness disclosure dated June 30, 2016, but was not named in Dr. Moon's discovery answers. Dr.

Moon's Rule 213(f)(3) answers, also filed on June 30, 2016, listed only Dr. Overton, an emergency medicine physician, as his expert. Dr. Moon's answers included the following:

"Defendant adopts and incorporates the disclosures and/or opinions made under this subsection, including those previously filed and those which may be filed in the future, of Rule 213 by any other party to this litigation to the extent that the disclosures and/or opinions benefits Defendant. This adoption should not be construed to include the adoption of any disclosure/opinion that are considered adverse or contrary to Defendant's position.

Defendant adopts herein and reserves the right to call any Rule 213(f)(1), 213(f)(2) or 213(f)(3) witness disclosed by any other party or previously disclosed and the right to elicit opinion testimony on either direct or cross-examination of those witnesses consistent with those disclosures. Defendant also reserves the right to cross-examine any witness called by any party pursuant to the Supreme Court Rules, including adverse witnesses pursuant to Section 2-1102 of the Illinois Code of Civil Procedure, and therefore, the scope of examination of the adverse witness is not limited to those subject matters and opinions disclosed in their discovery deposition or other records.

\* \* \*

Defendant reserves the right to withdraw any of the above witnesses and to call or cross-examine any witness at trial who has been identified by the Plaintiff on any topic such witness disclosed by interrogatory, by deposition or by trial testimony. Defendant also reserves the right to supplement these disclosures with any additional witnesses pursuant to court order

¶ 31    Similarly, in Wilson's Rule 213 answers, she made a nearly identical statement adopting

the Rule 213(f)(3) witnesses disclosed by other parties:

"Plaintiff reserves to supplement and the right to call any witnesses disclosed by any of the parties to testify concerning issues referenced in the parties' disclosures and/or the depositions of each such witness and adopts their disclosures as though fully set forth herein. Plaintiff reserves the right to identify additional Supreme Court Rule 213 witnesses they may call at trial as discovery progresses and to supplement its Supreme Court Rule 213(f)(1) disclosures consistent with the court's case management schedule and applicable state and local court rules. ***

Plaintiff reserves the right to disclose any additional 213(f)(2) witnesses at the appropriate time in the future, and supplement their response, in accordance with the applicable Illinois Supreme Court Rules, applicable local rules, and any court order. Plaintiff retains the right to call to testify any witnesses disclosed by any other party to this litigation and adopt their disclosures as though fully set forth herein.

* * *

Plaintiff reserves the right to supplement when required by court order, and reserves the right to call any witnesses disclosed by any of the parties to testify concerning issues referenced in the parties' disclosures and/or the depositions of each such witness and adopts their disclosures as though fully set forth herein."

¶ 32    Wilson contends that once the hospital settled with her, if Dr. Moon intended to call an expert from the hospital's witness list, then Dr. Moon should have expressly supplemented his list with that additional witness. Wilson contends Dr. Moon's nondisclosure of Dr. Tapson was prejudicial because she did not know until he testified whether his opinions were changed and she was unprepared to cross-examine him about his compensation because she had not issued

discovery as to how much he was being paid, the number of hours he spent reviewing the case, and when and by whom he was retained.

¶ 33   A trial court's decision on the admission of evidence will not be disturbed absent an abuse of discretion. *Lopez v. Northwestern Memorial Hospital*, 375 Ill. App. 3d 637, 645, 873 N.E.2d 420, 428 (2007) (reviewing the admission of expert testimony). A court abuses its discretion when no reasonable person would agree with the decision. *Lopez*, 375 Ill. App. 3d at 645. The purpose of discovery rules about the " 'timely disclosure of expert witnesses, their opinions, and the bases for those opinions is to avoid surprise and to discourage strategic gamesmanship.' " *Lopez*, 375 Ill. App. 3d at 645 (quoting *Thomas v. Johnson Controls, Inc.*, 344 Ill. App. 3d 1026, 1032, 801 N.E.2d 90, 95 (2003)). Disclosures are mandated by Rule 213 and strict compliance with the rule's provisions is required. Ill. S. Ct. R. 213 (eff. Jan. 1, 2007); *Lopez*, 375 Ill. App. 3d at 645. The rules referenced in Dr. Moon's Rule 213 answers—Rules 213(f)(1), (f)(2), and (f)(3)—were references to lay witnesses, independent expert witnesses, and controlled expert witnesses. Ill. S. Ct. R. 213(f)(1)-(3) (eff. Jan. 1, 2007). The latter type of witness, a controlled expert witness, is a person giving expert testimony who is the party, the party's current employee, or the party's retained expert. Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2007). Upon written interrogatory, Rule 213 requires parties to disclose, among other things, "the conclusions and opinions of the witness and the basis therefor." Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2007). Rule 213(g) limits expert opinions at trial to the information disclosed in answer to a discovery deposition or Rule 213(f) interrogatory. Ill. S. Ct. R. 213(f), (g) (eff. Jan. 1, 2007). Further, Illinois Supreme Court Rule 213(i) imposes on each party a continuing duty to inform the opponent of new or additional information whenever such information becomes known to the party. Ill. S. Ct. R. 213(i) (eff. Jan. 1, 2007).

"In determining whether the exclusion of a witness is a proper sanction for nondisclosure, a court must consider the following factors: (1) the surprise to the adverse party; (2) the prejudicial effect of the testimony; (3) the nature of the testimony; (4) the diligence of the adverse party; (5) the timely objection to the testimony; and (6) the good faith of the party calling the witness." *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 110, 806 N.E.2d 645, 652 (2004).

None of these factors are in Wilson's favor.

¶ 34     Dr. Tapson's testimony neither surprised nor unfairly prejudiced Wilson. Dr. Tapson's identity and opinions were disclosed to all the parties on June 30, 2016, some eight months before the March 2017 trial, when St. Bernard issued its Rule 213 answers. The fact that Dr. Moon was adopting Dr. Tapson's opinions was also known to Wilson some eight months prior because Dr. Moon's Rule 213 answers stated he "adopts herein and reserves the right to call any Rule 213(f)(1), 213(f)(2) or 213(f)(3) witness disclosed by any other party or previously disclosed and the right to elicit opinion testimony on either direct or cross-examination of those witnesses consistent with those disclosures." Wilson issued interrogatories and requests for production to confirm those opinions, and the hospital complied and provided all the information that Wilson sought. One of the documents produced was a letter confirming that Dr. Tapson was being retained for the purpose of defending "St. Bernard Hospital and Dr. Eric Moon." Wilson subsequently deposed Dr. Tapson and questioned him about his training and experience, his opinions and his bases for them, and his financial compensation. Thus, months before Dr. Tapson testified, Wilson was fully provided with all the available information about him. Dr. Moon points out that Wilson's purported prejudice due to a lack of financial information is belied by the fact that her attorney posed only one financial question at Dr. Tapson's deposition,

"Are you still getting paid $500 per hour no matter what?" Moreover, the trial court ordered Dr. Moon to give Wilson certain financial information in writing before Dr. Tapson took the stand; thus, Wilson had this information during the cross-examination. As for the nature of Dr. Tapson's testimony, it was specific to PE disease, and it helped the jury understand the nature of this ailment and how difficult it is to diagnose and effectively treat PE. Dr. Tapson has devoted his entire career to improving the diagnosis and treatment of PE and came to the conclusion that Dr. Moon could not have prevented Curry's death. Moreover, Wilson's diligence and objection to Dr. Tapson's inclusion in the trial were not timely in light of the fact that Dr. Moon's Rule 213 answers, which expressly adopted the other parties' witnesses and their opinions, were filed many months before the trial. Once Dr. Tapson was on the stand, his testimony was apparently limited to the opinions and bases that had been previously disclosed either through his deposition or in the Rule 213 answers because Wilson made no specific Rule 213 objections while Dr. Tapson was testifying. We also note that Wilson's claim against St. Bernard was based solely on a principal-agent relationship between the hospital and the doctor, and she sued the hospital only because of what Dr. Moon allegedly did or failed to do in treating Curry in the St. Bernard emergency room. That being the case, Dr. Tapson did not offer an opinion for St. Bernard that was somehow different from the opinion he offered for Dr. Moon. Finally, there is no suggestion that Dr. Moon was not acting in good faith by calling Dr. Tapson.

¶ 35     Dr. Moon points out that at the crux of Wilson's argument is her erroneous *assumption* that although Dr. Tapson had been disclosed, deposed, and adopted pursuant to Rule 213, Dr. Tapson would not be called to testify. Dr. Moon points to the lack of any factual or legal basis for Wilson's mistaken belief that she could prevent the jury from hearing from a controlled expert witness simply by settling with the party that initially contacted the expert and asked him

to be part of the defense team. If Wilson was unaware that Dr. Tapson was going to be called as a 213(f) retained witness, then it is only because counsel did not carefully review Dr. Moon's Rule 213(f)(3) disclosure. Dr. Moon has also pointed out that Wilson had similar language in her Rule 213 answers, which we quoted above, and that there must be some reason for parties to include this type of language. Despite Wilson's erroneous assumption, St. Bernard's settlement with Wilson did not change the fact that Dr. Tapson had been disclosed, subjected to Wilson's discovery, and adopted by another party prior to the trial.

¶ 36    There is no indication in the wording of Rule 213 that supports Wilson's argument. Wilson points out that St. Bernard was no longer a party after it settled with Wilson and was dismissed from the case. Wilson contends that the language in Dr. Moon's Rule 213 disclosure, in which he adopted and reserved the right to call any lay or expert witness that was "disclosed by any party or previously disclosed," was rendered meaningless once St. Bernard became a "former party." Wilson, however, overlooks the fact that St. Bernard was a party when Dr. Moon adopted all of its disclosed witnesses, regardless of whether St. Bernard continued to be a party or not.

¶ 37    There is also no indication in case law that supports Wilson's argument that a party who has generally adopted another party's expert opinions is supposed to submit a second disclosure containing all the same information of an earlier disclosure when that other party settles. Wilson's reliance on *Scassifero* is misplaced. *Scassifero v. Glaser*, 333 Ill. App. 3d 846, 770 N.E.2d 859 (2002). In that case, a patient sued his treating physician, the physician's partners, and the hospital where the patient was allegedly injured due to the physician's malpractice. *Scassifero*, 333 Ill. App. 3d at 850. The treating physician and his partners identified three experts. *Scassifero*, 333 Ill. App. 3d at 856. The treating physician and his partners also disclosed

that they were adopting and relying upon "the Rule 213(f) and (g) witnesses and their respective opinions as disclosed by the codefendant [hospital] in this matter." (Internal quotation marks omitted.) *Scassifero*, 333 Ill. App. 3d at 856. The codefendant hospital disclosed three experts, including Dr. Cybulski. *Scassifero*, 333 Ill. App. 3d at 857. The hospital later settled with the plaintiff. *Scassifero*, 333 Ill. App. 3d at 857. The treating physician and his partners took the further step of supplementing their Rule 213 disclosures to include Dr. Cybulski. *Scassifero*, 333 Ill. App. 3d at 857. The plaintiff, however, filed a motion to bar Dr. Cybulski from testifying on grounds that the disclosure by the physician and his partners was untimely. *Scassifero*, 333 Ill. App. 3d at 857. The trial court denied the motion and the ruling was affirmed on appeal. *Scassifero*, 333 Ill. App. 3d 846. The appellate court held, "[S]ince defendants *** clearly stated in their answers to plaintiff's Rule 213(g) interrogatories their intention to rely on Hinsdale Hospital's Rule 213(g) witnesses, Dr. Cybulski was timely disclosed." *Scassifero*, 333 Ill. App. 3d at 857. Thus, *Scassifero* is clear that timely adoption of another parties' expert is all that is necessary under Rule 213.

¶ 38    Wilson contends that *Scassifero* turned on the fact that the defendants supplemented their disclosures in order to expressly adopt Dr. Cybulski. However, it was only after first ruling that the adoption of another party's expert in answers to interrogatories was a timely disclosure that the court further supported its holding by stating: "We further note that defendants later supplemented their answers to plaintiff's Rule 213(g) interrogatories to specifically identify Dr. Cybulski. [Citation.] Under such circumstances, the purpose of Rule 213 disclosures was satisfied, and plaintiff cannot claim he was surprised." *Scassifero*, 333 Ill. App. 3d at 857. Thus, the court did not rule as Wilson argues. The court did not hold that a second disclosure of a Rule 213(f)(3) expert is required following a party's settlement from the case.

¶ 39 Wilson contends that another dispositive fact was that the *Scassifero* trial court "alleviated any potential prejudice to plaintiff by granting him the opportunity to call a rebuttal witness in response to Dr. Cybulski's testimony and by extending the trial date." *Scassifero*, 333 Ill. App. 3d at 858. Wilson contends she did not know until the first day of trial that Dr. Tapson was to be called as an expert witness and therefore did not know that rebuttal witness would be necessary. The quoted statement was made, however, in response to a different, subsequent argument in *Scassafero* and is not relevant here. Nothing in *Scassifero* requires that, following a party's settlement with the plaintiff, the plaintiff is entitled to a second opportunity to retain a rebuttal witness, and if necessary, be granted a continuance of the trial in order to obtain that witness.

¶ 40 Wilson has also erroneously relied on *Gee v. Treece*, 365 Ill. App. 3d 1029, 851 N.E.2d 605 (2006), as authority that there is a duty to supplement following a codefendant's settlement from the case. The case is factually distinguishable, in that Dr. Tapson was timely disclosed to Wilson, but the witness at issue in *Gee* was disclosed less than 60 days before trial. *Gee*, 365 Ill. App. 3d at 1036. *Gee* did not concern the timing of the initial or supplemental disclosures; rather, it concerned the fact that the original expert was no longer available for deposition prior to trial, but there was another expert who was available for deposition and would provide the same opinion testimony. *Gee*, 365 Ill. App. 3d at 1038. One expert witness was substituted for another, but the opinion and bases did not change, and the plaintiff could not claim prejudice by the change in experts.

¶ 41 We find no basis to support Wilson's first argument on appeal. Wilson's decision to settle with one of the codefendants did not change the contents or the timing of the other codefendant's Rule 213 answer. Accordingly, we hold that the language that we have discussed from Dr.

Moon's Rule 213 answer was sufficient disclosure of his intention to use the hospital's retained expert witness and that Dr. Moon was not required to supplement his Rule 213 answer in order to "redisclose" the expert after the hospital settled with Wilson.

¶ 42    Wilson's second appellate contention also concerns Dr. Tapson. Wilson contends that the trial court improperly curtailed her cross-examination of the hospital's pulmonary expert regarding "his credibility, bias, financial interest, and the like." "Each trial involves a search for the truth, and *** this search is facilitated by the opportunity to weigh the credibility of each witness." *Sears v. Rutishauser*, 102 Ill. 2d 402, 409, 466 N.E.2d 210, 214 (1984). A party may cross-examine an expert witness concerning his or her bias, partisanship toward testifying for plaintiffs or defendants, and financial interest in giving the testimony. See *Trower v. Jones*, 121 Ill. 2d 211, 222, 520 N.E.2d 297, 302 (1988). The scope and extent of cross-examination is a matter for the trial court's discretion, and unless that discretion is clearly abused, with resulting prejudice to a party, we will not disturb the ruling. *Hinnerichs v. Galbraith*, 40 Ill. App. 2d 433, 438, 189 N.E.2d 760, 762 (1963). Our review of the trial indicates that Wilson misconstrues the record. Wilson cross-examined Dr. Tapson by using a deposition he had given in a previous case, and thus addressed his credibility and bias. Wilson also had Dr. Tapson's curriculum vitae (provided at the time of his Rule 213 disclosure), but did not ask a single question about his credentials, his prior work as an expert witness, the number of cases in which he testified, or the percentage of cases where he appeared on behalf of the plaintiff as opposed to the defendant. Wilson questioned Dr. Tapson about the hours he had spent preparing for the trial, but did not ask about his hourly rate or total compensation. (Dr. Moon had already elicited on direct examination, "I charge $500 an hour," and when Dr. Moon asked Dr. Tapson about the hours he devoted to preparation, Dr. Tapson had testified, "I've got it written down someplace. I think,

including discussions with your group, reading the records, reviewing things, probably a total to date of about 15 to 18 hours. I'm not sure.") Wilson did not ask Dr. Tapson about the retainer he received. Although the trial court admonished Wilson not to disclose to the jury that Dr. Tapson was initially retained by St. Bernard, so as to not reveal that the hospital had settled, Wilson was free to elicit other details about his retainer, including its amount. We conclude that Wilson had sufficient opportunity to question Dr. Tapson about "his credibility, bias, financial interest, and the like" and that her questioning was not improperly curtailed.

¶ 43    Wilson's brief makes clear that she wanted to cross-examine Dr. Tapson about being previously retained by St. Bernard. Wilson argues, for instance: "Dr. Tapson testified that he received a copy of the St. Bernard Hospital records with respect to the decedent but [the trial court] overruled plaintiff counsel's foundation objection as to who supplied Dr. Tapson with those records. [Record citation.]" She also argues, "Because Dr. Tapson was original[ly] retained by St. Bernard Hospital, and Plaintiff's counsel was not allowed to bring this out during Dr. Tapson's testimony at trial, Plaintiff's counsel was allowed to make an offer of proof." Wilson reiterates that her intent was to reveal that the hospital had retained Dr. Tapson:

> "[The trial court] would not allow Plaintiff to cross-examine Dr. Tapson as to who actually retained him, would not allow Plaintiff to cross-examine Dr. Tapson with St. Bernard Hospital's Rule 213 disclosures, which was the only disclosure of Dr. Tapson that ever existed in this case, and would not allow Plaintiff to cross-examine Dr. Tapson with respect to the opinions held by Dr. Mark Cichon, the other 213(f)(3) retained expert witness for St. Bernard Hospital or regarding St. Bernard Hospital's theory of the case. [Record citation to Wilson's offer of proof.]"

¶ 44    The record indicates that the trial court was concerned that any mention of St. Bernard's

involvement in the case would reveal that the hospital had been a defendant but had settled with Wilson. It is within the sound discretion of the trial court to determine whether questions concerning settlement and the former party status of a witness are appropriate. *Garcez v. Michel*, 282 Ill. App. 3d 346, 348, 668 N.E.2d 194, 196 (1996). As pointed out above, a court abuses its discretion when no reasonable person would agree with the decision. *Lopez*, 375 Ill. App. 3d at 645. Generally, however, settlement negotiations and settlements are not admissible. *Garcez*, 282 Ill. App. 3d at 348-49. The two primary reasons for prohibiting the admission of negotiations and settlements are that (1) an agreement is not an admission of guilt and is therefore irrelevant, and (2) admitting evidence of negotiations and settlements would contravene public policy by discouraging litigants from settling prior to trial. *Garcez*, 282 Ill. App. 3d at 349. Here, the trial court concluded that Wilson's motive for questioning Dr. Tapson about his relationship with St. Bernard was for the purpose of placing the settlement, and the implication that Dr. Moon had been negligent, before the jury. Thus, the trial court appropriately restricted Wilson's cross-examination on this issue and did not unfairly prejudice her. Furthermore, even if it was error to prevent Wilson from eliciting the fact that the hospital had initially retained Dr. Tapson, it was a harmless error because the trial evidence as a whole overwhelmingly supported the jury's determination that Dr. Moon's treatment of Curry complied with the standard of care. *Baker v. Baker*, 412 Ill. 511, 519, 107 N.E.2d 711, 715 (1952) (where the reviewing court can see from the entire record that no injury occurred or that an error did not affect the trial's outcome, the judgment will not be disturbed).

¶ 45     Wilson's third argument for reversing the judgment is that Dr. Moon's closing arguments included improper comments on Wilson's failure to call an emergency medicine physician who was board certified in that field and her additional failure to call a pulmonologist.

¶ 46 Attorneys are permitted wide latitude in their closing arguments. *Guzeldere v. Wallin*, 229 Ill. App. 3d 1, 13, 593 N.E.2d 629, 638 (1992).

> "In contrast to the purpose and scope of a legitimate opening statement which is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony as a whole, the purpose of closing argument at the end of trial is to draw together all of the facts and to present the theories of the litigants so that the fact finder may make a proper decision." Jacob A. Stein, Closing Arguments, § 1:3 (2018).

¶ 47 Comments on evidence during closing argument are proper "if they are either proved by direct evidence or are a fair and reasonable inference from the facts and circumstances proven." *Guzeldere*, 229 Ill. App. 3d at 13; *Lebrecht v. Tuli*, 130 Ill. App. 3d 457, 484, 473 N.E.2d 1322, 1341 (1985). Furthermore:

> " 'A new trial is not warranted based on an improper opening statement or closing argument unless, when the trial is viewed in its entirety, the argument resulted in substantial prejudice to the losing party or rose to the level of preventing a fair trial. [Citations.] Errors in opening statements or closing argument *must* result in substantial prejudice *such that the result would have been different absent the complained-of remark* before reversal is required. [Citations.]' " (Emphases in original.) *Parsons v. Norfolk Southern Ry. Co.*, 2017 IL App (1st) 161384, ¶ 57, 88 N.E.3d 45 (quoting *Davis v. City of Chicago*, 2014 IL App (1st) 122427, ¶ 84, 8 N.E.3d 120).

¶ 48 Wilson objected during the closing arguments, but the trial judge overruled her objection. "In determining whether a party has been denied a fair trial because of the opposing party's closing argument, considerable deference is extended to the trial court's judgment, because the

trial court is in a superior position to assess the accuracy and effect of counsel's statements." *In re Salmonella Litigation*, 198 Ill. App. 3d 809, 820, 556 N.E.2d 593, 600 (1990); *Magna Trust Co. v. Illinois Central R.R. Co.*, 313 Ill. App. 3d 375, 396, 728 N.E.2d 797, 814 (2000).

¶ 49    During closing arguments, Dr. Moon addressed the credentials of Wilson's expert witness, by pointing out that Dr. Baker was not board certified in emergency medicine and that Dr. Baker did not lecture or publish articles on emergency medicine like Dr. Moon's experts, Dr. Tapson and Dr. Overton, who were speaking and publishing to their peers. These statements were factually true, and Wilson does not argue to the contrary. Dr. Moon argued that the reason Wilson did not have a board-certified emergency-medicine expert was because she could not find a board-certified expert to "come in and say that Dr. Moon caused this death." As Wilson herself points out, "[c]omments on evidence during closing argument are proper if they are either proved by direct evidence or are a fair and reasonable inference from the facts and circumstances proven." *Guzeldere*, 229 Ill. App. 3d at 13; *Lebrecht*, 130 Ill. App. 3d at 484. Dr. Moon's experts had more extensive training and experience, considerably more, in their respective specialties of pulmonary medicine and emergency medicine than Wilson's one expert had in these fields. Furthermore, Dr. Moon's two experts were devoted to the topics they testified about, in contrast to Wilson's only expert, who testified that he was splitting his work week between an emergency room, a family practice office, a rehab facility, and a tattoo removal facility. Dr. Moon's inference as to why Wilson did not have a board-certified emergency physician on her side was consistent with the factual evidence. Thus, the record indicates Dr. Moon's remark about Wilson's case was not an improper remark. Furthermore, viewing the trial as a whole, the comment was not capable of causing substantial prejudice to Wilson.

¶ 50    Dr. Moon also commented on Wilson's failure to call a pulmonology expert to testify and

that an inference to be drawn from that is that "they couldn't find one." In support of her argument, Wilson cites *Rutledge v. St. Anne's Hospital*, 230 Ill. App. 3d 786, 791, 595 N.E.2d 1165, 1168 (1992), which indicates a party was denied a fair trial, in part, because counsel commented on the failure to call an unavailable witness "when that witness is not under the opponent's control." See also *Lebrecht*, 130 Ill. App. 3d at 484 (indicating that generally it is improper to comment on an opponent's failure to call a witness that is not under their control). "The danger is that the jury will presume the testimony would have been unfavorable to the noncalling party." *Lebrecht*, 130 Ill. App. 3d at 484. Dr. Moon's remark about Wilson's strategic choice to not call her own pulmonology expert is not the same as remarking on an opponent's failure to call an admittedly unavailable witness. Thus, Wilson's citation to *Rutledge* is unavailing. *Rutledge*, 230 Ill. App. 3d 786. The witness at issue in *Rutledge*, a physician named Detrana, was unavailable to any party due to an illness. In addition, the parties had stipulated that Detrana was unavailable for this reason. *Rutledge*, 230 Ill. App. 3d at 791. The reviewing court noted, "even though the parties had discussed and agreed that Dr. Detrana was unavailable due to illness, defense counsel willfully disregarded the stipulation in a clear attempt to *mislead* the jury into believing plaintiff did not want the jury to hear Dr. Detrana's testimony." (Emphasis added.) *Rutledge*, 230 Ill. App. 3d at 791. In Wilson's case, however, there was no stipulation as to why Wilson did not retain or call a pulmonology expert (or why she chose to rely entirely on a non-board certified emergency medicine expert) to support her claim. Again, an attorney is permitted to argue the evidence and reasonable inferences from it. *Guzeldere*, 229 Ill. App. 3d at 13; *Lebrecht* 130 Ill. App. 3d at 484. In addition, there is no dispute that Dr. Moon's comments were true statements of fact, in that the only pulmonologist to testify for the jury was Dr. Moon's expert. Wilson had complete control over her trial strategy and the experts she retained. She

could have retained a pulmonology expert but, for whatever reason, she did not to retain one. There is no suggestion that Dr. Moon made the remark in order to mislead the jury in some way. Rather, the remark was part of a closing argument in which defense counsel drew together all the facts, made reasonable inferences, and presented a legal theory as to why the jury should reject Wilson's negligence suit. Dr. Moon's remark that Wilson had not called a pulmonology expert because she "couldn't find one," was proper argument based on the evidence presented during the trial. In addition, viewing the trial as a whole, we cannot say that this comment individually, or cumulatively, made a difference in the outcome of the trial.

¶ 51    Moreover, even assuming that Dr. Moon's attorney erred during closing arguments, the trial court cured any misstatement by instructing the jury that closing arguments are not evidence. The trial court instructed the jury: "A closing argument is given at the conclusion of the case and is a summary of what an attorney contends the evidence has shown. If any statement or argument of an attorney is not supported by the law or the evidence, you should disregard that statement or argument." Illinois Pattern Jury Instructions, Civil, No. 1.01 (2011). See *Randall v. Naum*, 102 Ill. App. 3d 758, 761, 430 N.E.2d 323, 325 (1981) (concluding that although defendant's counsel made an improper remark during closing arguments, it was cured when defendant objected and the trial court sustained the objection, admonished the jury to disregard it, and later instructed the jury to ignore any statement or remark that had no basis in the evidence).

¶ 52    For these reasons, we do not find that Dr. Moon's closing argument was improper.

¶ 53    The fourth issue is whether allowing Dr. Moon to call Dr. Overton and Dr. Tapson improperly resulted in cumulative expert testimony. The admission of evidence is at the discretion of the trial court, and in that discretion, the court may exclude cumulative testimony.

*Dahan v. UHS of Bethesda, Inc.*, 295 Ill. App. 3d 770, 781, 692 N.E.2d 1303, 1311 (1998). We will not reverse such rulings unless the trial court clearly abused its discretion. *Dahan*, 295 Ill. App. 3d at 781. The abuse of discretion standard is highly deferential to the trial court. *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 23, 957 N.E.2d 413. An abuse of discretion occurs when no reasonable person would take the view adopted by the trial court. *Taylor*, 2011 IL App (1st) 093085, ¶ 23.

¶ 54    In *Dahan*, the trial court did not abuse its discretion in allowing the defendants to call a hematology expert, a neurology expert, and a third physician, who testified as to the standard of care for an internist. *Dahan*, 295 Ill. App. 3d at 781. In *Taylor*, the trial court did not abuse its discretion in allowing the defendant-hospital to call one expert, a rheumatologist, and the defendant-doctor to call two experts, a rheumatologist and a neurologist. *Taylor*, 2011 IL App (1st) 093085, ¶¶ 36, 40. In *Moore*, the plaintiff permissibly elicited standard of care testimony from five physicians, four of whom had rendered medical treatment to the plaintiff, in a case involving an "extensive medical history" and an uncommon medical condition. *Moore v. Anchor Organization for Health Maintenance*, 284 Ill. App. 3d 874, 881, 672 N.E.2d 826, 832 (1996).

¶ 55    Similarly, here, the two doctors that Dr. Moon called to testify had different specialties and were called for different reasons. Dr. Tapson's testimony made clear that he is a board certified pulmonologist, not an emergency medicine expert, while Overton, an emergency medicine expert testified about the standard of care for emergency medicine physicians. Dr. Tapson's introduction to the jury detailed his deep interest, research, and experience in the diagnosis and treatment of PE. From his perspective as a PE specialist, Dr. Tapson critiqued Dr. Moon's diagnosis of Curry's symptoms as bronchitis and not PE. Toward the conclusion of his testimony, Dr. Tapson summed up that PE was his "focus" and "this particular disease is what

I've been studying for 25 years and think about all the time." Similarly, the testimony that Wilson and Dr. Moon elicited from Dr. Overton made clear that his specialty was emergency medicine. The direct and cross-examinations also made it apparent that Dr. Overton had evaluated Dr. Moon's conduct from the perspective of an emergency medicine specialist. Both of Dr. Moon's experts testified about PE and the methods of detecting and treating PE. There was some overlap and repetition between the two experts, caused in part by Wilson's questioning. Given that a PE caused Curry's death and that Dr. Moon's diagnosis and treatment of Curry in the emergency room were at the heart of Wilson's lawsuit, every medical witness necessarily testified about PE. Dr. Moon was entitled to call the two experts to defend against Wilson's claims, and Wilson was also entitled to present medical experts in order to make her claim and rebut Dr. Moon's defense. Even though the defendant hospital and defendant physician disclosed a pulmonary expert and an emergency medicine expert within the discovery deadline set by the trial court, plaintiff Wilson did not retain her own pulmonology expert during that timeframe. Wilson's decision to rely on Dr. Baker as her only expert can be attributed to trial strategy or her litigation budget, but that does not transform Dr. Moon's two distinct experts into improperly cumulative witnesses.

¶ 56    Wilson's fifth and final contention is that her cross-examination of Dr. Moon was improperly limited, in that she was not permitted to elicit standard of care testimony from him, specifically whether the standard of care for emergency room medicine required Dr. Moon to order an ultrasound in order to diagnose DVT. The record indicates that, prior to the cross-examination, the trial court had granted Dr. Moon's motion *in limine* to bar testimony regarding the use of an ultrasound. Wilson's expert, Dr. Baker, did not offer any opinion or criticism on this issue and had not indicated that ordering an ultrasound was the standard of care or that

taking an ultrasound could have somehow prevented Curry's death. Furthermore, at St. Bernard, ultrasound technicians were not available during the overnight hours when Curry was in the emergency room, and there was no evidence that an ultrasound technician or ultrasound machine was available while he was at the hospital.

¶ 57    When Wilson cross-examined Dr. Moon, a sidebar was called. Outside the presence of the jury, Wilson argued that since Dr. Moon had brought up an ultrasound test in response to a nonleading question, Dr. Moon had opened the door as to whether the standard of care required an ultrasound to detect a DVT. The trial court rejected Wilson's argument then and when Wilson presented the argument for a second time in a postjudgment motion for a new trial. The trial court's written order denying a new trial details why Wilson was not permitted to pursue this line of questioning: Wilson had not previously disclosed any evidence to support this theory of malpractice liability (she had no other evidence to support this new theory of malpractice liability), and allowing Wilson to pursue a new theory of malpractice liability on cross-examination of the defendant doctor without any basis in the testimony of Wilson's disclosed expert would have violated the 213 disclosures and could have confused or misled the jury.

¶ 58    We reject Wilson's contention that she should have been able to pursue a line of questions regarding an ultrasound test. The mere reference during cross-examination to a procedure that was barred by a motion *in limine* would not necessarily allow the plaintiff to delve into that procedure in detail if the evidence did not support that theory of liability.

¶ 59    Wilson now cites authority for the proposition that a standard of care may be established by testimony from the defense (see, *e.g.*, *Anderson v. Martzke*, 131 Ill. App. 2d 61, 65, 266 N.E.2d 137, 139 (1970) (testimony of a defendant doctor may be sufficient to satisfy the requirement that there be expert testimony as to the issue of acceptable medical standards of care

in a community)). Wilson, however, does not cite authority refuting the trial court's concern that introducing an entirely new theory of malpractice liability on cross-examination would tend to mislead or confuse the jury. Illinois law indicates that evidence may be excluded on the basis of its perceived tendency to confuse of mislead the jury. *Dial v. City of O'Fallon*, 75 Ill. App. 3d 782, 785, 394 N.E.2d 84, 87 (1979) (otherwise admissible evidence may be excluded as irrelevant when it does not concern facts in issue and could only serve to mislead or confuse issues in case); *Maffett v. Bliss*, 329 Ill. App. 3d 562, 574, 771 N.E.2d 445, 455 (2002) (even relevant evidence may be excluded if its probative value is substantially outweighed by factors such as prejudice, confusion, or the potential of misleading the jury); *Demos v. Ferris-Shell Oil Co.*, 317 Ill. App. 3d 41, 53, 740 N.E.2d 9, 18 (2000) ("even if the evidence is arguably relevant it may still be excluded if it would confuse the issues or tend to mislead the jury"). In addition to her failure to cite legal authority, Wilson fails to factually address the trial court's concern that she would have been pursuing a new theory of malpractice liability that would only serve to mislead or confuse the jury. None of Wilson's pretrial disclosures indicated an ultrasound was within the standard of care in Curry's case, or that if an ultrasound had been ordered it could have prevented the development of Curry's saddle pulmonary embolism. Thus, the sole basis of evidence would have been Dr. Moon's cross-examination. Wilson failed to follow through on the trial court's proposal that Wilson later "[m]ake a record" and "bring the witness to the witness stand and make an offer of proof." Without a record of what Dr. Moon would have testified to if Wilson had been permitted to pursue her line of questioning, we cannot make a determination that the limitation of her cross-examination of Dr. Moon was an abuse of discretion. *Schaffner v. Chicago & North Western Transportation Co.*, 129 Ill. 2d 1, 38, 41 N.E.2d 643, 659 (1989) (in the absence of an offer of proof, the reviewing court was unable to determine whether the trial

court's limitation on cross-examination constituted an abuse of discretion). Thus, we reject Wilson's final argument as well.

¶ 60                                    III. CONCLUSION

¶ 61     Having considered and rejected all of Wilson's arguments, we affirm the judgment of the trial court in favor of Dr. Moon and against Wilson.

¶ 62     Affirmed.